STATE OF MISSOURI, Respondent, v. JAMES L. TYSON, Appellant, No. 43481—258 S. W. (2d) 651.

Division One, June 8, 1953.

*Harry E. Whitney* for appellant.

*John M. Dalton,* Attorney General, and *Robert R. Welborn,* Assistant Attorney General, for respondent.

1244

██ HYDE, P.J.—Defendant was found guilty of murder in the second degree and sentenced to ten years in the penitentiary. He has appealed but filed no brief. It is, therefore, our duty to examine the record and consider the assignments of error in defendant's motion for new trial. (Sec. 547.270 [653] RSMo. V.A.M.S.; Sup. Ct. Rule 28.02; State v. Miller, 357 Mo. 353, 208 S. W. (2d) 194.) There are 17 assignments in his motion.

We find no error in the record proper. Assignments 6, 12 and 16 raise questions of the sufficiency of the evidence and defendant's right to a directed verdict. These contentions require a statement of the facts. The deceased, Jackson Tillford, was at the "Blue Room" cocktail lounge in the Street Hotel on the northeast corner of 18th Street and The Paseo in Kansas City, Missouri, about 1:15 A. M. January 15, 1951, with Beatrice Dixon. Tillford and Miss Dixon left a few minutes later to go to his car, which was parked on The Paseo south of 17th Street. Miss Dixon said that, when they reached the car, Tillford unlocked the door next to the curb and she got in; and that he went to the rear of the car to get in on the other side. She reached over to unlock the door on the left side and, as she did so, she heard shots. She looked out and saw a man running through a nearby parking lot. She got out of the car and saw Tillford lying near the rear of the car between the sidewalk and the curb. Miss Dixon then went to the Flora Avenue Police Station, stated what had happened, and police officers and a deputy coroner were sent to the scene. Later on defendant called the station and asked that police officer Omar Brown come to the home of his aunt and uncle, where he had gone after the shooting. When Brown, and another officer, arrived there, about 2:00 A. M., defendant told them he had shot Tillford and handed him a pistol, saying: "that is the gun I shot Tillford with." Brown asked why he did it and he said "he had to."

After he was taken to the police station, Officer Myron Crowley, of the Homicide Bureau, said that defendant told him he had previously had trouble with Tillford and that when he saw him at the

"Blue Room", he went to his car and got his revolver. He related defendant's further statement as follows: "He told me he left the Blue Room at about 1:15 and that he started to walk north on Paseo on the walk and Mr. Tillford and a colored lady followed him out of the tavern and started walking in the same direction, and when they got to a point about 100 feet north of the entrance of the Blue Room, which faces Paseo, he called to Mr. Tillford and says, 'I want to talk to you a minute', and Mr. Tillford walked over to where he was, he had his hands in his pockets, and he told me he thought he had a gun in his pocket and he pulled out his revolver and shot him." (Miss Dixon said she never saw defendant at the "Blue Room" or ahead of them after they left.) The police and coroner found no weapon of any kind on or about Tillford. His keys were on the ground just to the right of the body. There were two holes, made by bullets, over Tillford's left eye and another on the left side of his neck.

Defendant testified as follows at the trial. He told of two previous fights with Tillford (in one of them Tillford had a gun which others took from him) and of threats Tillford had made to kill him. He said he did not own an automobile and did not leave the "Blue Room" to get a revolver when he saw Tillford there. He took the gun with him when he left his room about 8:00 P.M. He had it in a shoulder holster. He saw Tillford looking at him in the "Blue Room" and when he left and was walking north on The Paseo he heard footsteps behind him. He turned around and saw Tillford and "a lady was beside him, walking." His version of what happened was: "When I turned around and saw Jackson Tillford he was standing, walking, close to the curbing like, right at the sidewalk (indicating), and when I turned he hit his pocket like this (indicating) and stepped beside a car there, and I remember saying, 'Wait, let's talk this over', and when he ducked beside the car and did that again the shooting happened. * * * At the time that I told him let's talk it over and he stepped aside by his car, some car, like that, I didn't know, I didn't wait to see if he had a gun. * * * I thought that he had a gun. If I had of waited, I don't know if he had a gun or not, then I probably wouldn't have fired."

We obviously must hold that the State made a jury case. The State's evidence showed that Tillford was unarmed and was busy unlocking the car and intent [654] on getting in and driving away. Tillford had to go away from where defendant was (when defendant saw Tillford and his companion walking behind him) to go behind the car to get in on the other side. Defendant fired four or five times and Tillford was hit three times. The jury could reasonably have found that defendant was the aggressor, taking Tillford by surprise. Defendant admitted the shooting and his version claiming self-defense was for the jury.

■ Defendant's assignments 1 and 2 have been ruled against his contentions by our decision in State v. McHarness (Mo. Sup.), 255 S. W. (2d) 826. These were motions to quash the jury panel and to suppress all evidence on the ground that the entire panel was illegally selected. This case was tried before the McHarness case so that the ruling therein as to the purpose and effect of Sec.'s. 497.010, 497.130, and 497.140 RSMo. V.A.M.S. must be held applicable here.

■ Defendant's assignments 3 and 5 allege error in admitting State's exhibits 5 and 8, which were photographs showing the position of Tillford's body with respect to the sidewalk, curb and the rear of his car. (Admission of exhibit 5 is also referred to in assignment 17.) They were taken by a police photographer the night of the shooting before the body was moved. They, and exhibit 7 to the admission of which no objection was made, were taken from different angles and distances. The substance of the objection to exhibit 8 was that it showed nothing not shown by exhibit 7 already in evidence. Exhibit 5 was offered with exhibit 2, and they were taken at less distance than the other two. The objections were that the State's purpose was to prejudice and inflame the jury and that these pictures could prove nothing that had not been testified to by the State's witnesses. The Court ruled that both close-up pictures were unnecessary and admitted only exhibit 5. It does show blood on the ground and near Tillford's head but it shows the position of his body with reference to the curb and the rear of his automobile much clearer than either of the other pictures.

As we said in State v. Morris, (Mo. Sup.), 248 S. W. (2d) 847, l.c. 849: "It is true that if the exhibition of gruesome photographs to the jury would serve no useful purpose in proving the crime, the trial court in the exercise of a sound discretion may exclude them." However, we held the admission of photographs of the body of the deceased therein was not error. Likewise, in State v. Finn, (Mo. Sup.), 243 S. W. (2d) 67, l.c. 70, we held admissible photographs of the deceased at the scene of the killing just after the occurrence. We said, among other things, "They tend to establish the conditions which there existed, where the deceased lay in relation to the automobile, the position of the car with relation to the house." (See also State v. Lawson, 360 Mo. 95, 227 S. W. (2d) 642, and cases cited 227 S. W. (2d), l.c. 645.) We think the photographs admitted herein not only tend to establish the existing conditions but also to corroborate Miss Dixon's account of what occurred. It is not a valid objection that witnesses have testified to matters shown by photographs because pictures give a much clearer impression of many things than any oral description and that is the reason for using them. We hold they were properly admitted.

■ Defendant's assignment 4 alleges error in permitting Officer Crowley to testify to statements made by defendant at the police

station when he was brought in after the shooting. The ground of objection was that defendant had made a later written statement (not in evidence) and that "the statement the defendant made in writing is the best evidence." This is not a situation in which the best evidence rule is applicable. As said in McDaniel v. Commonwealth, 183 Va. 481, 32 S. E. (2d) 667, l.c. 670: "We are dealing here with something heard by witnesses. The fact that one of them afterwards reduced it to writing does not make the others incompetent. This is not a case in which by secondary evidence it is sought to prove the contents of a writing, which is itself, of course, the best evidence of what is there written. Here all this evidence is primary, stemming from a common source." (See also [655] People v. Giro, 197 N.Y. 152, 90 N. E. 432; Elkins v. State, 250 Ala. 672, 35 So. (2d) 693; 20 Am. Jur. 379; 22 C.J.S. 1457, Sec. 833; 1 Wharton's Criminal Evidence, 11th Ed. 652, Sec. 409, and p. 658, Sec. 415; State v. Decker, 326 Mo. 946, 33 S. W. (2d) 958, l.c. 961-962.) Here the witness was not testifying to what was in defendant's written statement but to admissions defendant made before there was any written statement. We hold that there was no error in admitting this testimony.

■ Defendant's assignment 7 alleges error in overruling his objection to the cross-examination of his witness Lee Williams. He saw part of the fight between Tillford and defendant in October 1950 but admitted that he had been drinking during the four or five hours before the fight. He testified that defendant was smaller than Tillford. He said: "I said I'd judge him (Tillford) to be half a head, maybe, taller." The prosecuting attorney then asked: "By half a head, how many inches would you say, bearing in mind your condition?" Objection was made on the ground that this was slurring the witness and the Court said: "You may cross-examine." The prosecuting attorney then asked: "How many inches taller was Tillford?" and Williams answered: "I'd say maybe eight or ten, something like that." While the question objected to was argumentative, after the objection a proper question was asked and answered. Argumentative questions are improper. (State v. Carroll, (Mo. Sup.), 188 S. W. (2d) 22.) However, "the trial court has considerable discretionary latitude in controlling the cross-examination." (State v. Rhoden, (Mo. Sup.), 243 S. W. (2d) 75 and cases cited.) Unless this discretion is clearly abused the appellate court will not interfere. (State v. Whipkey, 358 Mo. 563, 215 S. W. (2d) 492.) The trial court had this matter before it in passing on the motion for new trial and was in a better position than we are to determine whether it had any prejudicial effect. We, therefore, overrule this assignment.

■ Defendant's assignments 8 and 9 allege error in sustaining an objection to a question to defendant's witness, Alonzo Dix, as to

a conversation between him and Tillford concerning defendant. It is stated in the motion for new trial that this conversation was concerning threats made by Tillford against defendant which were communicated to him. However, the Court was not informed about this at the time the State's objection was made. Thereafter, this witness was permitted to testify that Tillford told him about a fight with defendant and said: "When I meet him again I'll finish him up." He also said he told defendant what Tillford had said and defendant also later testified that Dix had told him about this threat. Therefore, defendant could not have been prejudiced by this first ruling and we overrule this assignment.

Defendant's assignments 10 and 11 allege error in refusing to sustain his objections on cross-examination of his witness Eugene McFarland and objections to his own cross-examination. McFarland testified about a fight between defendant and Tillford in a drugstore when both were arrested by the police. He said Tillford had a gun; that defendant held Tillford's hand so he could not use the gun; and that Tillford's cousin then took the gun from him. McFarland was asked: "When did you first see the gun?" Instead of answering, McFarland repeated the question and the prosecuting attorney then said: "If you ever saw it." McFarland answered: "I saw it when he took it out of his pocket." Defendant's objection was made after this answer and the Court said: "It has been answered." Nothing further was said by defendant's counsel and no other action requested. The other question was as to how many similar fights McFarland had seen. This question was not answered and was not repeated after objection to it was made. The question to defendant, asked after he said he left the "Blue Room" to go to the home of his aunt and uncle, was: "How many times would you go there, to your uncle's and aunt's, at 3 or 4 o'clock in the morning?" We see nothing improper in this question under the circumstances. The authorities we referred to in ruling assignment 7 are applicable here and we overrule these assignments.

Defendant's assignments 13, 14, 15 and 17 allege error in rulings in connection with the arguments to the jury. However, the arguments are not before us because not contained in the bill of exceptions and transcript as agreed to by counsel and certified by the trial judge. (State v. York, (Mo. Sup.), 142 S. W. (2d) 91; State v. Hampton, (Mo. Sup.), 172 S. W. (2d) 1; State v. Hiller, (Mo. Sup.), 208 S. W. (2d) 265; State v. Parrish, (Mo. Sup.), 214 S. W. (2d) 558.) From our examination of the record, it appears that defendant was well represented and had a fair trial without prejudicial error.

The judgment is affirmed. All concur.