**STATE of Missouri, Respondent,**

v.

**Thomas Erwin MOORE, Appellant.**

No. 45434.

Supreme Court of Missouri,
En Banc.

June 10, 1957.

**62**

J. Arnot Hill, Kansas City, for appellant.

John M. Dalton, Atty. Gen., Julian L. O'Malley, Asst. Atty. Gen., for respondent.

STORCKMAN, Judge.

The defendant, Thomas Erwin Moore, was charged in the Circuit Court of Jackson County with the crime of murder in the first degree. The information alleged that he killed his wife by shooting her with a shotgun. A jury found him guilty as charged and assessed his punishment at death. Sentence and judgment were rendered against him in accordance with the verdict.

The defendant, 40 years of age, had been previously married and was divorced in the spring of 1954. He had no children of his first marriage. On June 26, 1954, he married Opal Irene Searcy, a widow. After the marriage they lived at 309 Barat Street in Kansas City, a two-story residence property owned by the wife. Mrs. Moore's three children by her previous marriage lived with them. On January 10, 1955, a daughter was born of the marriage of the defendant and Opal Irene. About two weeks before May 5, 1955, an altercation occurred during which the defendant slapped his wife. There was a hearing in police court and, at the request of the wife, the judge ordered the defendant to stay away from 309 Barat Street except that he was permitted to go back one time to get his clothes and other property, which he did; however, the defendant only took his work clothes and left his other possessions behind.

The wife was killed on May 5, 1955, shortly after 6:00 o'clock a. m., by a shotgun charge fired into her left upper chest. Apparently she died instantly. The state's only eyewitness to the shooting was deceased's daughter Wanda, then 16 years of age. Wanda testified that she and her mother had slept in the same bed in a bedroom on the first floor of the home. Her brother Gene, 17, and her sister Beverly, 9, occupied sleeping quarters on the second floor. The front door was open but the screen door was closed and latched with a hook.

About 6:10 a. m. Wanda was awakened by hearing someone trying to open the front screen door. The person at the front door then "went in the dining room, it sound-

ed like they were knocking over some chairs, then we heard someone fooling with the telephone and they came to the bedroom and it was my stepfather," the defendant. Wanda was on the side of the bed next to the wall and her mother was on the other side next to a night stand beside the bed. The defendant moved a chest of drawers and took from behind it one of three shotguns he had left there. He told Wanda and her mother not to move until he told them to; he walked to the night stand, took from it a shotgun shell, and, loaded the gun. While he was doing this he said to his wife, "I guess you know your time is up." There was a short period of conversation, not over five minutes, during which defendant told his wife "he wanted her to come back and she wouldn't." He told Wanda "he liked us kids" and she told him "we would have liked him too if he had treated us right." Wanda got over in front of her mother and "he told me to move or he would shoot me, too." Her mother then told her "to get back over there" which she did. Her mother started to get up and the defendant told her to stay where she was. He was holding the loaded shotgun and his wife "told him to put the gun down and behave himself and quit trying to scare" the kids. Mrs. Moore got up to a sitting position on the edge of the bed; "she started to reach over to the night stand and he shot her." When Wanda saw the wound in her mother's chest and saw her mother fall to the floor she started screaming, jumped from the bed, ran from the bedroom and out of the house. As she did so she heard her brother and sister coming down the stairs. After she was outside Wanda heard two other shots fired. Wanda further testified that the defendant talked as if he had been drinking, but otherwise he appeared to be normal.

Gene Searcy, sleeping upstairs, was awakened by a loud noise that sounded like a tire blowing out. Hearing his sister Wanda screaming, he put on his pants and ran downstairs. His sister Beverly ran down the stairs just ahead of him. He heard a second report as he was coming down the stairs. Wanda was in the living room screaming and crying, "Mother, Mother." She started running out onto the front porch and Gene told Beverly to go out there too. Gene saw the defendant lying on the floor in the passageway between the living room and the bedroom. His head was in the living room and his feet were in the bedroom; the shotgun was laying across his chest. He appeared to be unconscious but his face was not bloody. Almost immediately the defendant got up and started toward the night stand in the bedroom. Gene went into the bedroom and saw his mother lying on the floor between the night stand and the bed. Defendant went to the night stand and got out a shell; as he did so Gene told him to put the gun down. The defendant didn't pay any attention and started into the bathroom. Gene again told him to put the gun down. By that time the defendant had loaded the gun; he pointed it at Gene and told him to get out. The defendant then laid down on the floor of the bathroom and put the gun up to his head with the barrel on his nose pointing up to his forehead. At this Gene ran out the front door onto the front porch. Neighbors had gathered outside by this time and police officers arrived shortly thereafter.

In her testimony Beverly Searcy stated that she awakened on the the morning in question and heard somebody talking downstairs. She heard her stepfather say that her "Mama was going to die." She went downstairs just ahead of her brother Gene. She went to the bedroom where her mother was but her brother sent her and her sister out on the front porch and some neighbors came and took Beverly to their home.

Virgil McGough, the first police officer to arrive, found Gene and Wanda sitting on a divan and he asked them what the trouble was. They were hysterical, Wanda was very hysterical, but finally said, "My stepfather has killed my mother and shot himself." The officer went into the bedroom and found the body of Mrs. Moore on the

bedroom floor. The defendant was lying on the bathroom floor. He was alive but there was a hole in his forehead where part of his skull had been shot away and he was bleeding profusely. Other officers arrived and they were able to get the defendant up into a sitting position. They put a towel around his head to catch the flow of blood and steadied him as he sat there. During this time the defendant was mumbling incoherently but after the ambulance arrived one police officer heard him say to the doctor, "Looks pretty bad, doesn't it?" The defendant was able, with assistance, to walk to the stretcher in the dining room. An officer testified the defendant was willing to walk and said he could do it.

A police officer took pictures at the scene of the slaying and made a floor plan that was used at the trial. A charge from the shotgun had been fired into the top of the archway under which the defendant was lying at the time he was first seen by Gene. There was evidence that the hook fastening on the front screen door had been pulled out and that the telephone wires in the dining room had been torn from their connections. It was necessary to use an outside telephone to call the police.

The defendant chiefly relied upon a defense of insanity existing at the time his wife was slain. The defendant's father testified that the defendant stayed at the home near Holt until he was 25 years old and caused his father no trouble whatsoever. The son then married and moved to Polo, 20 or 25 miles away. The son farmed for about 14 years and they worked back and forth quite a bit. The son left the farm and worked in Kansas City for a couple of years before this happening. The father never knew of his son being involved in any act of violence until this occurrence.

The defendant testified that he was by occupation a farmer until he moved to Kansas City about two years before. He had never been convicted of any crime. He had been living with his wife, Opal Irene, until about two weeks before May 5. He tes-

tified that he had been drinking some the night before the slaying but had gotten some sleep. His purpose in going over was "to get the rest of my clothes and what odds and ends I had." He did not go over there to kill his wife. He said the front screen door was not locked and denied that he had forced it open or that he had torn the telephone wires from the wall. He said he went to the bedroom, moved the chest and got one of the shotguns he had left there; his intention was to take the guns apart and wrap them. As to what happened after that he testified at one time, "I don't actually remember, I shot myself, other than that I actually don't know what happened." He was grief-stricken over the loss of his family. He said he had no recollection of shooting his wife. He claimed that Wanda wasn't in the room when the shots were fired, that she had run out and her doing so was the first knowledge he had that anybody was in the house. He testified that Wanda had jumped out of bed, screamed, and was on the way out, possibly at the front door, when he fired a shot at himself.

On cross-examination the defendant conceded that he had slapped his wife about two weeks before May 5 and that he went over to the house that morning in violation of court orders and he didn't notify Mrs. Moore or any of the children that he was coming. He stated that when he took the gun from behind the chest of drawers Wanda jumped out of bed, screamed and ran, and that he said to her, "Wanda, what is the matter?" He testified that he shot himself with the first shot and couldn't remember anything that happened after that; he didn't even remember loading the gun. The next he remembered was when he was in the hospital. He said that the girl's screaming and his nervousness were probably what caused him to shoot himself. He denied having any conversation with his wife and testified that he had no recollection of his wife's being there. When asked whether he had a recollection of pointing the gun at his wife and telling her that he was going to kill her and then

discharging the gun and killing her, his answer was, "This is all news to me, I have no recollection about it." He had no explanation of how his wife was shot right over the heart; however, he did not mean to suggest that someone other than he shot his wife. There were three or four shotgun shells in the night stand. He himself never left a loaded shotgun in the house. When he put the guns in the corner behind the chest they were not loaded. His belief was that the first shot he fired inflicted the damage to his forehead but conceded there was no blood in the passageway where he claimed to have shot himself. Other essential parts of the evidence will be referred to in the course of the opinion.

The defendant contends that the court erred in admitting in evidence state's photographic Exhibits 4, 5 and 6, and particularly Exhibit No. 4. These photographs, among others, were taken by police officers in the bedroom where Mrs. Moore was slain and before the body was moved. Exhibit 6 was a general view of the bedroom showing the bed, the night stand, the dresser and the body of Mrs. Moore on the floor between the bed and the night stand. Exhibit 5 was a view looking downward showing the body of Mrs. Moore on the floor and a portion each of the night stand and of the bed. Exhibit 4 is a closeup view of the upper portion of the body showing the wound in the left upper chest and the left forearm, a portion of which was torn away by the blast.

The first witness was the coroner, Dr. Hugh H. Owens, who testified that the cause of the death was a gunshot wound in the left chest; that the right side of the heart was almost completely torn away and the left lung was collapsed. He was followed by Officer Robert W. Wark, a police laboratory techician, who made a sketch of the first floor plan and took the pictures. After the three exhibits were identified they were offered in evidence. Exhibits 5 and 6 were admitted over defendant's objection; Exhibit 4 was excluded at

that time. During cross-examination of the defendant Exhibit 4 was reoffered and admitted over the defendant's objection. The state offered the exhibit on the theory that the location of the wound showed that the defendant acted consciously and took accurate aim and that it tended to refute defendant's testimony.

The rule as to the admissibility of this sort of visual evidence is well settled. Demonstrative evidence of this character is admissible if it tends to connect the accused with the crime, or to prove the identity of the deceased, or show the nature of the wound, or throw any relevant light upon a material matter at issue. State v. Shawley, 334 Mo. 352, 67 S.W.2d 74, 82 [14]; State v. Porter, 276 Mo. 387, 207 S.W. 774, 777 [4]. Defendant concedes that the admission of this sort of evidence is largely within the discretion of the trial court, but contends that the court, in admitting the exhibits, abused its discretion, saying that the photographs were unnecessary and should have been excluded because "the identity of deceased, the position of the body and the nature of the wounds had been exactly and precisely established by other evidence."

Even if we assume that there was evidence upon all of the material facts shown by the photographs it does not follow that the exhibits were inadmissible. In State v. Tyson, 363 Mo. 1242, 258 S.W. 2d 651, 654 [4], we find this statement relating to the application of the rule: "It is not a valid objection that witnesses have testified to matters shown by photographs because pictures give a much clearer impression of many things than any oral description and that is the reason for using them." See also State v. Evans, Mo., 237 S.W.2d 149, 151 [2].

Another factor bearing upon the propriety of admitting the photographic exhibits is that they tended to corroborate the testimony of state's witnesses, and the state, having the burden of proving defendant's guilt beyond a reasonable doubt,

should not be unduly limited as to the quantum of its proof. State v. Shawley, 334 Mo. 352, 67 S.W.2d 74, 83; State v. McDaniel, 336 Mo. 656, 80 S.W.2d 185, 192–193 [4]. The exhibits especially tend to corroborate the testimony of Wanda Searcy as to the manner and circumstances under which Mrs. Moore was slain and show more clearly the position and proximity of Mrs. Moore, the defendant and the witness at the time the crime was committed. The coroner had testified there were powder burns on the victim's chest. Exhibit 5 may be an unnecessary duplication of matters shown in less detail in Exhibit 6, but the court did not abuse its discretion in admitting it. It must be borne in mind that the defendant's plea was not guilty and even when he testified he did not admit that he shot his wife. He said he didn't recall what happened.

As a part of the same contention, the defendant claims that the pictures are gruesome and that their introduction into evidence was for the sole purpose of inflaming the minds of the jurors against the defendant. If the exhibits satisfy the rule as to the admission of demonstrative evidence, it is not a sufficient cause for their rejection that the sight of them would tend to agitate the feelings of the jurors. State v. Laspy, Mo., 298 S.W.2d 357, 361 [9]; State v. McDaniel, 336 Mo. 656, 80 S.W.2d 185, 193 [5].

It is true that the trial court, in the exercise of a sound discretion, may and should deny the admission and exhibition of gruesome photographs to a jury if they do not tend to throw any relevant light upon a material issue. State v. Tyson, 363 Mo. 1242, 258 S.W.2d 651, 654 [3]; State v. Long, 336 Mo. 630, 80 S.W.2d 154, 160 [9]. A note of caution was sounded in State v. Laspy, Mo., 298 S.W.2d 357, 361 [7], as to the use of manifold views of the same or similar scenes or objects.

Exhibits 5 and 6 show the scene of the crime and the position of the body more clearly than it could be portrayed in words. These photographic exhibits and the floor plan made by the police laboratory technician served a useful purpose in the trial of the case. They portrayed the physical facts in a way that avoided the confusion and uncertainty sometimes attendant upon oral description. They give a much clearer impression of the location and activities of the parties involved and bear upon the credibility of the witnesses including the defendant. Exhibit 4 shows the precise location of the wound and throws light upon defendant's contention that he did not consciously or voluntarily shoot his wife. In State v. Smith, Mo., 261 S.W.2d 50, the defendant testified that he did not remember firing the gun and the court permitted a demonstration of the action of the gun as bearing upon the improbability of his not remembering; the trial court's ruling was approved.

If the photographic views are shocking and horrible it is because the crime is one of that sort, whether described in words or pictures. Some phases of the oral testimony are as likely to cause agitation as the pictures. This is particularly true of the testimony of the coroner and of Wanda Searcy and her brother. There is no claim that the pictures tend to exaggerate or falsify the physical situation in any particular.

The record fails to disclose any evidence of bad faith on the part of the prosecuting attorney in the introduction or use of these exhibits. We find that there was no abuse of the court's discretion in admitting state's Exhibits 4, 5 and 6 in evidence.

The defendant next contends that the trial court erred in making "unauthorized and prejudicial comments on the evidence" in the presence of the jury. He specifies three instances which he charges are violations of Section 546.380 RSMo 1949, V.A.M.S. which provides that "The court shall not, on the trial of the issue in any criminal case, sum up or comment upon the evidence, or charge the jury as to matter of fact, * * *." See also 42 V.A.M.S. Supreme Court Rule 26.09.

State v. Castino, Mo., 264 S.W.2d 372, 375, cited by defendant, correctly states the rule for judicial guidance as follows: "The rule is well settled that a fair trial exacts absolute impartiality on the part of the judge as to both his conduct and re-marks. A judge must not say anything that can be construed by the jury to the prejudice of a defendant."

The rule is tempered in its application by consideration of the circumstances under which the statements are made, as shown by State v. Hyde, 234 Mo. 200, 136 S.W. 316, 332: "Objection is made to remarks and comments by the court in the presence of the jury. When a trial judge is conscientiously striving to do his duty, and is engaged in a long drawn out, arduous, and hotly contested trial, it would be captious and unfair to criticise adversely every utterance of doubtful propriety. He is obliged to act and speak without time for calm deliberation, and is often fretted beyond the limits of patience by persistent counsel. The record in this case indicates a single purpose on the part of the trial judge—to permit a full and fair investigation of the facts and the law in this case."

The first complaint is based upon this sequence during defendant's direct examination:

"Q. Were there any shots fired to your knowledge while Wanda was in the room? A. No, sir. I didn't know there was even anybody in the room.

"Mr. Ewing: If the Court please, I am going to object to this question and answer for the reason this man said he doesn't have any recollection of what happened other than the shooting of himself, he turns right around and says she wasn't in the room.

"Mr. Hill: That is subject to cross examination, your Honor.

"The Court: The objection will be sustained as to that particular question and his answer. *It is in conflict with each other, the answers are.* [Proceedings out of the presence of the jury at this point are omitted because not relevant to the question presented.]

"Q. (By Mr. Hill) Can you tell, Mr. Moore, if you consciously fired the shot while Wanda was in the room? A. I did not. When she jumped out of the bed, screamed and ran that is the first I knew anyone was in the house.

"Q. Which occurred first, did you fire the shot at yourself before or after she left the room? A. She was on the way out, I would say possibly at the front door. In fact, I don't know exactly where she was at to be honest, I know she ran out of the room."

The part objected to is shown in italics. The prosecutor's objection came after the answer, the answer was not stricken, and the defendant's examination on the same subject matter was completed. The court's comment was in reply to a remark by defendant's counsel to the court; it was directed to counsel in explanation of the court's ruling and was not directed to the jury. These circumstances are to be considered in determining if the comment was erroneous. State v. Van Horn, Mo., 288 S.W.2d 919, 922 [7–9]. The court's remarks in explaining his ruling were not unwarranted and were not comments on the evidence in the sense that term is used in defining the province of the court and the jury. State v. Van Horn, supra; State v. Murphy, 341 Mo. 1229, 111 S.W.2d 132, 135 [6, 7].

Next defendant complains of the following comment by the court as a part of a ruling during the cross-examination of the defendant: "In view of the testimony of the defendant I am going to withdraw my ruling on State's Exhibit 4 and the State may offer the exhibit again." The defendant claims that the court's comment indicates a disbelief of defendant's testimony and disparages it. We do not think that

the remark is subject to that construction. This is not a comment on the evidence, but an explanation of his ruling which was again directed at counsel and occasioned by a discussion by the counsel with respect to the admissibility of the exhibit.

It appears that the court might have, in the proper exercise of his discretion, admitted Exhibit 4 when it was first offered. Its relevancy became more apparent during the defendant's testimony. While he did not deny shooting his wife, still he did not admit it and the state had to assume the full burden of proving that issue. We are not called upon to decide what the situation might have been if the defendant had admitted firing the shot which killed his wife.

■ The last item in this category is the trial court's statement to the jury just before he started to read the instructions. The part objected to is the last sentence of the introductory remarks and is shown in italics in the statement which, in full, is as follows: "The Court: Now, gentlemen of the jury, the Court will at this time endeavor to instruct you in the law of this case. This has been a very short case for the nature of it, all of the evidence was heard in one day. It is my duty now to instruct you in the law of this case and after that these gentlemen will sum up the evidence for you after which time the matter will be in your hands for your verdict. *I am sure you will have no trouble at all in arriving at your verdict.*"

The defendant interprets this as meaning that the court thought that the jury would have little difficulty in finding the defendant guilty. We do not think that the statement, taken in context, is subject to this construction. It must be considered in connection with the court's statement that the case was a short one and that all the evidence was heard in one day. The testimony was not long and involved. The remark was unnecessary and might better have been left unsaid; but again, as stated in the Hyde case, supra: "It would be captious and unfair to criticise adversely every utterance of doubtful propriety." We do not construe the statement as an intimation that the court believed that the jury would return any particular verdict, but merely that the trial was a comparatively short one and that the testimony to be reviewed was not extensive.

■ In connection with all three of these complaints it should also be noted that by Instruction No. 9 the jurors were instructed: "The jury are the sole judges of the credibility of the witnesses, and of the weight and value to be given to their testimony." Thus, in a lasting fashion, the jury was told that regardless of what might have occurred or been said during the trial, that they alone had the right to determine what issues of fact had been proven.

It should be further noted that the record shows throughout a meticulous regard by the court for the right of the defendant to be tried fairly and impartially. On several occasions during the course of the trial this right of the defendant to a fair trial was emphasized, not only by the court but by the prosecuting attorney. On the record before us, we have no hesitancy in holding that the remarks of the court complained of did not constitute prejudicial error.

The defendant also contends that the court erred in restricting the opening statement of his counsel in view of the defendant's plea of insanity. The defendant's counsel, in his opening statement, said that the defendant was despondent because he was denied the right to see his daughter, that he felt if he killed himself the wife would feel badly about it, and that "it was within his knowledge that her first husband had committed suicide." In sustaining the prosecutor's objection the court said: "The testimony or the offer of testimony that you have just recited would not be competent in this case, under any circumstances that I could see." The court then told the jury "to disregard the statement of counsel as to the death, violent or otherwise of a former husband of this deceased." De-

fendant's counsel then continued with his opening statement. The defendant made no offer of proof, either during his opening statement or at any time during the presentation of his case.

■ While great latitude is allowed in the admission of evidence in a criminal case where a defense of insanity is interposed, the evidence nevertheless must be relevant and material to the issue of defendant's mental condition at the time of the commission of the act charged, and the trial court remains vested with some discretion and duty to keep the inquiry within reasonable limits. State v. Linders, Mo., 224 S.W.2d 386, 389 [5]; State v. Murphy, 338 Mo. 291, 90 S.W.2d 103, 111 [6]; State v. Warren, 317 Mo. 843, 297 S.W. 397, 401; State v. Porter, 213 Mo. 43, 111 S.W. 529, 534.

■ The part of the opening statement to which objection was sustained does not seem to be relevant or consistent with the theory of defense sought to be established by defendant's own testimony. In substance, he testified that his intention in going to the house that morning was to get his clothes and other possessions. He so stated his purpose on at least two occasions. He testified that he got the shotgun from behind the chest of drawers in order to break it down and wrap it up along with the others so he could carry them away; that he never did see his wife in the bedroom and did not know anybody was there until Wanda started screaming, jumped from the bed and ran out of the room; that he then shot himself in the forehead and remembered nothing more until he was in the hospital. On direct examination he testified:

"Q. (By Mr. Hill) What did you do in connection with the gun in order to carry it away from there? A. I didn't get anything done with it. I intended to take the forearms off of them and take them apart and wrap them up, that is what I intended to do.

"Q. Go ahead and tell us what happened after that. A. Well, as I said awhile ago, I don't actually remember, I shot myself, other than that I actually don't know what happened.

"Q. Why did you shoot yourself? A. Well, I was just grief stricken, I guess.

"Q. You were grief stricken? A. Because I had lost my family.

"Q. I am sorry, I can't hear. A. I was just grief stricken over the loss of my family."

On cross-examination he further testified on this same subject: "Q. Mr. Moore is it your testimony the girl's screaming is the first thing that made you grief stricken? A. Well, due to my nervousness and all it is probably what made me shoot myself, yes." He further testified that he had no intention of shooting himself when he went to the house.

The defendant was permitted to testify without objection that he was nervous and upset because of the loss of his family. This was the gist of the matters referred to in the opening statement. The defendant was also permitted to testify without objection that he tried to take his own life and did inflict serious wounds which presumably caused him not to remember what happened thereafter. As defendant's testimony developed it tended to prove that if he killed his wife he did it unknowingly and without intent as a result of self-inflicted head wounds. According to his testimony, whatever mental derangement he had at the time of the slaying did not result from the emotional disturbances referred to in the opening statement, but from traumatic causes. However, the defendant did have the benefit of an instruction on insanity.

■ The court did not abuse its discretion in excluding from the defendant's opening statement the cause of the death of the previous husband of Mrs. Moore. A similar situation was involved in State v. Murphy, 341 Mo. 1229, 111 S.W.2d 132,

135 [4], wherein this court held that the sustaining of objections during an opening statement and reprimanding counsel was not "so harassing and prejudicial as to force counsel to cease and abandon his statement of appellant's defense." The record herein does not disclose that the defendant was prejudiced by the court's ruling.

The defendant charges error in the refusal of the trial court to give Instruction A, a character instruction, requested by the defendant, reading as follows: "The Court instructs the jury that in determining as to the guilt or innocence of the defendant, you should take into account the testimony in relation to his character as for *peacefulness* and you should give to such testimony such weight as you deem proper; but if from all the evidence before you, you are satisfied beyond a reasonable doubt, as defined in these instructions, that the defendant is guilty, then his previous good character, if shown, cannot justify, excuse, palliate or mitigate the offense, and you can not acquit him merely because you may believe he has been a person of good repute." The court gave a character instruction identical with the one above set out except that the one given has the word "violence" where the italicized word "peacefulness" appears in refused Instruction A.

■ Section 546.070(4) RSMo 1949, V.A.M.S., provides that the court, whether requested or not, must instruct the jury in writing "which instructions shall include, whenever necessary, the subjects of good character and reasonable doubt; * * *." The term "whenever necessary," as used in the statute, means that such an instruction is necessary only where there is substantial evidence tending to show the good character of the defendant. State v. Turner, Mo., 272 S.W.2d 266, 271 [14, 15]; State v. Baird, 288 Mo. 62, 231 S.W. 625, 627 [6], 15 A.L.R. 1035.

■ The evidence as to defendant's character, good or bad, was rather scant.

His father testified that the defendant "stayed at home until he was twenty-five years old and never caused me no trouble whatsoever." For fourteen years after the son married and moved away the father maintained contact with his son and he never knew of his son "being in any act of violence" until he came "over here." The cross-examination started with these questions and answers:

"Q. Mr. Moore, you say that your son had never been involved in any violence before this? A. Not when he was at home, he stayed at home until he was twenty-five years old.

"Q. As far as you know this was the only time? A. Yes.

"Q. So you are testifying as to his good character? A. Yes, sir, after he came over here, I didn't know anything about it."

It appears that the defendant had been living in Kansas City for about two years before the occurrence in question and the father was not acquainted with his son's activities during that time. There was other evidence in the case that the defendant had been hailed into police court for slapping his wife about two weeks previously and had been permitted to go back to his wife's home on only one occasion to get his clothes and other property. The defendant contends that the evidence was sufficient to justify submitting the issue of "good character" and we shall assume without deciding that such was the case for the purpose of determining the question presented. Instructions in the general form of Instruction 8 and Instruction A have been approved in State v. Darragh, 152 Mo. 522, 54 S.W. 226, 229 (No. 18), 233 [8], and State v. Wilson, 230 Mo. 647, 132 S.W. 238 [1]. For similar character instructions see 2 Raymond, Missouri Instructions 103, §§ 3561–3579. The narrow question presented is whether the defendant, under the circumstances of this case,

was entitled to have the instruction read "character as to peacefulness" rather than "character as for violence."

First it will be noted that the term "peacefulness" for which defendant contends was not used in any of the testimony as to character, either in the questions or the answers. The father was interrogated as to his knowledge of "any acts of violence" committed by his son. The term used in the instruction given was injected into the case by the defendant. Furthermore, a person may have a good or bad reputation as to violence, just as he may have a good or bad reputation as a man of peace or for peacefulness. The manner in which the term is used in the instruction given does not preclude the jury's finding that the defendant had a good reputation or character with respect to "violence," just as they could have found under Instruction A that he had a bad reputation or character as to "peacefulness." This is made more evident from the fact that the express term "previous good character" is used in the latter part of the instructions. Under the circumstances, we do not think that the instruction unduly stresses violence as opposed to peacefulness. The character instruction, as given, is a departure from the usual form of presentation and is not to be recommended; however, under the particular facts of this case, prejudicial error was not committed by the refusal to give the instruction in the form requested by the defendant.

The defendant further requests that this court consider reducing the punishment assessed by the jury from death to life imprisonment. Section 546.430 RSMo 1949, V.A.M.S.; Supreme Court Rule 27.04. The circumstances under which this extraordinary power may be used is reviewed and the rule stated in the recent case of State v. Laster, Mo., 293 S.W.2d 300, 304–305 [3]. We abide by the ruling in the Laster case and on the record before us decline to interfere with the punishment assessed by the jury.

The defendant was ably represented at the trial and on appeal. He was accorded a fair trial and the record reveals no error justifying a reversal. Accordingly, the judgment is affirmed.

All concur.

Date of execution set for Friday, July 26, 1957.