**STATE of Missouri, Respondent,**

v.

**Willie EVANS, Appellant.**

**No. 51887.**

Supreme Court of Missouri,
Division No. 1.

Oct. 10, 1966.

Norman H. Anderson, Atty. Gen., Jefferson City, Bruce Normile, Special Asst. Atty. Gen., Edina, for respondent.

J. Whitfield Moody, Sloan Richard Wilson, The Legal Aid and Defender Society of Greater Kansas City, Kansas City, for appellant.

HOUSER, Commissioner.

Willie Evans has appealed from a judgment of conviction and 10-year sentence on a charge of second degree murder.

In his brief and in oral argument his counsel on appeal makes three points.

First, error is assigned in the admission of State's Exhibit 6, which is a typewritten question and answer statement, prepared by a police detective and signed by appellant

with an "X" mark. In it appellant recited the facts surrounding the shotgun shooting of Earl Carmichael by defendant. Appellant complains that the statement should not have been admitted in evidence because appellant could not read the statement; that he did not know exactly what was in it; that it was not an accurate record of what he intended to communicate to the detective, and that parts of it were inconsistent with his assertion of self-defense. Appellant says the detective who took the statement paraphrased his words. For instance, instead of the word "drunk," which appellant used, the detective wrote the word "intoxicated"; instead of referring to "the incident" or some such innocuous descriptive term the detective inserted the language "the aggravated assault," which words appellant did not use and which contradicted his recital of a set of facts showing that he shot in self-defense. Appellant claims that the detective changed his words around so as to phrase the statement in a manner which was "appropriate" or "more fitting" for the benefit of the police department. He says the officer was "more guided by his own idea of what he wanted the appellant to say than what the appellant was actually trying to convey." It is further objected that the question "Have you been advised that you do not have to make a statement and if you do, anything you say can be used against you and you have the right to consult with counsel?" and the answer "Yes" written in by the detective is *not convincing* that appellant actually knew what he was doing and understood his rights. Conceding that a "formal, cursory" statement of his rights was made to appellant, it is urged that the officer told appellant that he would "have" to sign the statement with the word "Yes" written in after the waiver of constitutional rights, and that if appellant could not do it the officer himself would do it. Appellant concludes that the statement was not voluntary.

At appellant's request the court conducted a preliminary inquiry on the question of voluntariness, outside the hearing of the jury. Then the detective who took the statement testified in extenso before the jury concerning the method and manner of interviewing appellant and taking the statement, as follows: The interrogation and composition of the statement occupied about 30 minutes. At its inception appellant was informed that the questions to be directed to him related to the shooting of Earl Carmichael (who at that time had not died); that appellant had been booked as a suspect; that the information obtained from appellant, if he was willing to give it, would be used against him in court; that appellant did not have to tell the officer anything, or answer any questions, or make any statement in regard to this charge, and that he had the free use of the telephone to contact counsel if he so desired. No coercion, threats, duress or promises were used to force the making of the statement. Appellant was "very cooperative" and "quite willing" to make a statement, saying "I don't have anything to hide. I shot him and that's all there was to it." After he heard appellant's version of the facts it appeared to the detective that it was a case of self-defense and he considered that appellant was cooperative "because he felt that he had acted in self-defense." The detective would ask appellant a question, get his answer, and then write down question and answer. In preparing the statement the detective was as exact as possible. The statement is the best record of the information obtained from appellant. He did not always use appellant's exact language, and in several instances paraphrased the answers given, but the statement is an accurate statement of the information communicated to the detective by appellant. When the statement was completed it was handed to appellant who stated that he did not have his glasses and could not see. The officer offered to and did read it to appellant, thoroughly and slowly, so that any discrepancies between his actual answers and the written report of them could be corrected and changed. At appellant's request he changed the language from "I shot him one time" to "I shot

him one time, or at least I shot at him," with the explanation that he did not know or realize that he had actually struck Carmichael until the latter came back outside and told appellant he did not need to shoot him. He read the statement to appellant twice. Appellant said that it was the truth; that "that was the way it was." When asked to sign it defendant again stated that he did not have his glasses and could not see so well. Appellant was then asked to sign it by making an X Mark, which he did.

Appellant took the stand at the trial and testified to a set of facts which, if believed, would have entitled him to an acquittal on the ground of self-defense, as follows: After having remonstrated with appellant for having "bothered" his girl friend Carmichael, whose hand had been "shaking" in his jacket pocket, drew out a butcher knife, with the blade pointing at appellant, and came toward appellant. Appellant backed up to a door, opened the door, went inside and got a loaded shotgun which was in a corner by a table. When Carmichael jerked the door open appellant told him to turn the door loose and get out, whereupon Carmichael said "I'm coming in there to get you" and made "another lunge" at appellant. At that time, as Carmichael was moving toward appellant, the latter shot him. Appellant was frightened, believing that Carmichael intended to stab or cut him. On cross-examination appellant testified that he gave the detective a statement that he shot Carmichael "to keep him from cutting me," but claimed that the detective "didn't write it that way." In this claim appellant is mistaken. The statement recited that after the remonstrance about "bothering" his girl friend Carmichael pulled a butcher knife out of his jacket pocket and started toward appellant, who broke and ran to his apartment, where he picked up the shotgun; that he was trying to save himself; that he had been cut before and was not taking any chances. There was one discrepancy between the statement and appellant's testimony at the trial. The statement recited that when Carmichael saw the shotgun he started to run down the hall towards Carmichael's apartment; that appellant followed Carmichael "and just as he got into his hallway" he shot him. Those recitals implied that appellant shot Carmichael as the latter was retreating, not as he was advancing upon, appellant. On the stand, however, appellant repeatedly denied that he told the detective that Carmichael started to run when he saw the shotgun. In substantially all other respects appellant confirmed and did not repudiate the statement. He said he signed the statement without fear because he figured he had a right to try to protect and defend himself. Appellant did not claim that he was unable to read or write because of illiteracy, but accounted for his inability to read on the ground that he could not *see* to read.

If believed, the detective's testimony demonstrates clearly that State's Exhibit 6 was voluntarily given after adequate advice to appellant as to his constitutional rights; that in all substantial particulars the exhibit accurately reported the interview; that appellant was not imposed on by the officer or deceived as to the contents of the statement but was fully informed and knew and understood what the statement contained when he attested to it by making his mark. The inconsistency between appellant's testimony on the stand that Carmichael was advancing upon him and the recital in the statement that appellant was following Carmichael down the hall when he fired the shotgun did not make the statement inadmissible in evidence. It merely created a fact issue. Whether appellant made that damaging statement when interviewed by the detective was a question of fact for the jury to resolve. It is true that the detective paraphrased appellant's statements, but not to the prejudice of appellant. Except in cases of verbatim transcription some reconstruction of the words of the person being interviewed, by the person composing the questions and answers, is inevitable. A full and complete

opportunity was given appellant to expose any imposition on him or any twisting of the meaning of his words in the "translation." Appellant's counsel conducted a careful and searching cross-examination of the detective on this phase of the case, covering nearly 30 pages of the transcript. The subject was very fully and adequately explored, to the maximum benefit of defendant. There was no error in the admission of State's Exhibit 6 in evidence.

Appellant's second point is that the court erred in overruling appellant's objection to the final argument of the prosecuting attorney "that the defendant would go out and shoot another person if not convicted." This point is based upon these two sentences excerpted from the argument: "if it goes unpunished, how many more will happen tonight?" and "* * * you decide if that is going to be permitted. If it is going to be permitted then this man and that society is going to breed more and more evil, but if we put a stop to this—* * *."

The argument was made in answer to defense counsel's references to race, neighborhood and sociology. The assistant prosecuting attorney, after arguing that in a case of killing of a man because of a threat it makes no difference what the man's race is or where he lives; that the law is the same on Ward Parkway as at 17th and Forest. Continuing, he said: "Gentlemen, if we are going to have a jungle society at 17th and Forest, out on Ward Parkway, or anywhere in Jackson County, it is because just such things as this go unpunished. You are the only ones, you twelve men are the only ones, that can decide whether or not this will stop. These men on the Police Department can't stop it. I do my best when I present the case to you, but, gentlemen, I tell you it stops right here, I can go no further with it, you are the ones who are going to decide if there is going to be a jungle law down there where a man can execute any possible threat, run after him and fire through a window and take his life, or whether he is going to

live under the same law that you live under and that I live under. Gentlemen, don't blame the neighborhood. If you blame the neighborhood, the neighborhood will continue, it will continue to bear evil like this if we let this go. If it goes unpunished, how many more will happen tonight? You gentlemen, you twelve men, are the community of Jackson County to decide right now. It is your duty to decide. If you are satisfied of this man's guilt, that he without any just cause, any just cause as you know it, took a man's life by chasing him down and when he turned around fired through a window, you decide if that is going to be permitted. If it is going to be permitted then this man and that society is going to breed more and more evil, but if we put a stop to this—

"MR. HARRINGTON: Objection. He is arguing this man would go out and kill someone else. He says this man and that society is going to breed more and more evil. I believe that is clearly objectionable. I ask for a mistrial.

"THE COURT: Overruled."

The argument is unexceptional. The gist of the argument is that in order to prevent the breakdown of law and order it is necessary for the community to punish a person who is guilty of an unjustified killing, and that if satisfied of this man's guilt the jury had the duty to decide whether this should be permitted; and that if it is allowed to go unpunished other crimes will result. The whole argument was predicated upon a preliminary finding of the guilt of the defendant.

■ The necessity of law enforcement as a deterrent to crime, State v. Jones, Mo. Sup., 384 S.W.2d 554; State v. Feltrop, Mo. Sup., 343 S.W.2d 36; State v. King, Mo. Sup., 334 S.W.2d 34; the evil results which will flow to society from a failure of the jury to do its duty, State v. Groves, Mo. Sup., 295 S.W.2d 169; State v. Cox, Mo. Sup., 352 S.W.2d 665; State v. Feltrop, supra; and the responsibility of trial juries

in the suppression of crime, State v. Jones, supra; State v. Feltrop, supra; State v. Turner, Mo.Sup., 320 S.W.2d 579, are legitimate arguments, as long as the prosecutor stays within the record and the reasonable inferences to be drawn therefrom, State v. Jones, Mo.Sup., 384 S.W.2d 554, and does not make an inflammatory appeal so as to arouse the personal hostility of the jurors toward defendant, such as implanting in their minds the fear that defendant's acquittal will endanger their own personal safety or that of some member of their families. State v. Groves, Mo.Sup., 295 S.W.2d 169. This is particularly true when, as here, the request for a conviction is related to a finding of guilt. State v. Turner, supra. These rules were not violated in this instance and there was no error in overruling appellant's objection to the argument.

Appellant's third point is that the court erred in admitting in evidence the blood-stained clothing of the deceased. Two articles of clothing worn by deceased when shot, apparently a shirt and undershirt, stained with dried blood, were admitted over objection that they would not tend to prove or disprove any issue in the case and were introduced for the sole purpose of inflaming the jury. The articles contained holes made by the shotgun blast. Offered as physical evidence to show the pattern of the shot and the size of the wound, they were admitted for the purpose of showing the location of the wound. Appellant claims the exhibition of the bloody garments was not justified because there was no dispute as to the location of the wound, and that every witness who viewed the body of deceased gave an accurate, precise and consistent description of the location, size and nature of the wound (approximately two inches in diameter, in the abdomen on the right side, just above the belt line).

 This type of demonstrative evidence is admissible if it shows the nature of the wound or throws any relevant light upon a material matter at issue. State v. Moore, Mo.Sup., 303 S.W.2d 60, and cases cited, l. c. 65. Its admission or rejection is a matter within the sound discretion of the trial judge. We find no abuse of discretion. The mere fact that there was evidence upon all of the material facts shown by the exhibits does not necessarily make them inadmissible. Even more so than in the case of photographs, the articles of clothing themselves "give a much clearer impression * * * than any oral description and that is the reason for using them." State v. Tyson, 363 Mo. 1242, 258 S.W.2d 651, 654 [4]. Furthermore, as pointed out in State v. Moore, supra, 303 S.W.2d, l. c. 65, the state should not be unduly limited in the quantum of the proof, since the state has the burden of proving defendant's guilt beyond a reasonable doubt. These exhibits graphically showed the pattern of the shot, the size of the wound, and the location of the wound. The shirt showed that the shot struck the front of the body of deceased. While this did not aid the state's theory that Carmichael was retreating when shot, it did bear definitely upon the issue of self-defense. By demonstrating that Carmichael was shot as he faced appellant the exhibits tended to support appellant's theory, and to this extent their admission was not prejudicial, but actually helpful, to appellant. While appellant complains that the exhibits were inflammatory, he does not contend that they were gruesome, and as a practical matter it is difficult to believe that their admission prejudiced appellant, who received the minimum sentence at the hands of the jury.

We find no prejudicial error respecting the sufficiency of the information, verdict, judgment and sentence.

The judgment and sentence is affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.