**STATE of Missouri,**
**Plaintiff-Respondent,**

v.

**Lindol CURTIS, Defendant-Appellant.**

**No. 39712.**

Missouri Court of Appeals,
St. Louis District,
Division One.

Oct. 10, 1978.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 17, 1978.

Application to Transfer Denied
Dec. 18, 1978.

Gary L. Robbins, Public Defender, Jackson, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, Hal E. Hunter, Jr., Pros. Atty., New Madrid, for plaintiff-respondent.

CRIST, Judge.

This is an appeal from a conviction on two counts for murder in the first degree. Defendant was found guilty and sentenced to life imprisonment on each of the two counts, to be served consecutively. Defendant had entered a plea of not guilty by reason of insanity.

Defendant complains about (1) the admission of two photographs which were alleged to be inflammatory and (2) permitting an expert to testify as to the mental competency of the defendant when said opinion was alleged to be based upon the report and opinion of another expert. We disagree.

On May 7, 1974, Mary Louise Curtis lived in a five room house near Portageville, New Madrid County, Missouri. She was a former wife of defendant. They were divorced in 1973. Living in the house with Mary Curtis were Susan Gwaltney, her mother, and her children by a previous marriage, Brenda Underwood, Elmer Underwood, Elaine Underwood and Louis Underwood. Defendant and Mary Curtis had no children of their own.

In the afternoon of May 7, 1974, defendant was in the vicinity of the house occupied by Mary Curtis, her mother and her children by a former marriage. Defendant had car trouble and was stopped near the Baderville Bridge, about one mile from the house. About 4:30 p. m., Mary Curtis, Susan Gwaltney, Brenda Underwood and Elaine Underwood were in a car taking Brenda to Risco, Missouri. The occupants of this car observed defendant beside his car which was apparently torn up.

Mary Curtis talked to defendant and gave him food at that time. There seemed to be no problem. At about six or seven o'clock, Elmer Underwood observed defendant sitting in his car much closer to the house.

At about 10:30 p.m. on that date, Brenda Underwood returned to her home accompanied by Mark Squires and noticed defendant's car close to the driveway. Mary Curtis asked Mark Squires to take defendant to Portageville and he agreed to do so.

Brenda Underwood went into the house and noticed that the defendant was there. A problem arose whether or not Mark Squires would take defendant to Portageville and Mark left without him. As Brenda Underwood was preparing to go to bed, she heard her mother and defendant talking in the living room. Defendant called Brenda Underwood, Susan Gwaltney, and Mary Curtis to the living room and Mrs. Gwaltney sat in a chair with Mary Curtis, on the arm of the chair, while Brenda sat in a recliner close by. Defendant had some clothing in his hands and he dropped them to reveal a gun in his hand.

At that time, Brenda observed defendant shoot Mary Curtis and saw Susan Gwaltney jump up and run toward the kitchen. She heard more shots as she was running from the house. In her effort to leave the house, Brenda initially went into the bedroom where her sister and brother slept, turned around, ran through the living room and jumped over the bodies of Mary Curtis and Susan Gwaltney which were lying on the floor. Brenda Underwood went to a neighbor's house to report what had happened.

Earlier in the evening, Elaine and Elmer Underwood had gone to bed. At about 10:30 p.m. Elmer was awakened by gunshots. He opened the door of his bedroom, looked out, and observed Mary Curtis, Susan Gwaltney, Brenda Underwood and defendant in the living room. Defendant told Elmer to go back to bed. Elmer went back to bed as told and was once again awakened by gunshots. He opened the same door to the living room and saw his mother lying on the floor, screaming.

Within the same time, Elaine Underwood was awakened by noises, opened the front bedroom door and saw defendant shoot her mother. As she looked into the living room, she observed defendant shoot her mother and saw her grandmother, Susan Gwaltney, lying on the floor. Authorities were summoned to the house and Mary Curtis was found to have been shot seven times and Susan Gwaltney had been shot three times.

Sergeant Duckworth of the Missouri State Highway Patrol took pictures of the bodies (Exhibits A & B complained about) and conducted an investigation at the scene. Later that evening, defendant was found sitting in his car in a barn approximately four miles from the house. He was unconscious and vomiting. Pills and an apparent suicide note were found in the car with him. Also in the car was a nine millimeter Walther pistol.

Defendant's lawyer, in his opening statement, stated that defendant did in fact shoot and kill Mary Curtis and Mrs. Gwaltney. Further, that his defense was based upon insanity, that is, he was suffering from mental defect so that he didn't know what he was doing.

Defendant complains about the introduction of State's Exhibits A and B. Both pictures are black and white exposures, one showing the deceased, Mary Curtis, lying on the floor in front of a chair with apparent bullet wounds and the second showing the deceased, Susan Gwaltney, lying on the floor in between two rooms. The pictures are before this court and there is nothing more inflammatory about these exhibits than there would be in almost any photograph of murder victims.

Photographs are admissible if they "throw any relevant light upon a material matter at issue." *State v. Moore,* 303 S.W.2d 60, 65 (Mo.banc 1957). The state still had to prove its case, for the reason that defendant entered a plea of not guilty by reason of insanity. His testimony was that while he was sure that he had killed the victims, he could not remember doing it. Manslaughter instructions were given. The photographs were relevant to show the nature and location of the victims' injuries and to show cause of death. Additionally, trial courts have wide discretion in determining the admissibility of photographs. *State v. Jackson,* 499 S.W.2d 467 (Mo.1973). We rule this point against the defendant.

Defendant's complaint about Dr. Tuttle testifying as to the competency of the defendant, when his opinion was allegedly based upon the report of another doctor, was not contained in his Motion for

New Trial. Accordingly, nothing is preserved for review. *State v. Flynn*, 541 S.W.2d 344 (Mo.App.1976).

 Furthermore, from our review of the record we find no plain error affecting substantial rights of defendant that could reasonably be deemed such that manifest injustice or miscarriage of justice has resulted from the testimony of Dr. Tuttle. Rule 27.20(c). While Dr. Tuttle testified that he had considered Dr. Arat's report, and that it may have influenced his opinion, he stated unequivocally that his opinion was based upon his own examination of the defendant. The question here is really one pertaining to the weight of the evidence. It is well established that the admission or exclusion of expert testimony is a matter largely within the discretion of the trial court, and the exercise of that discretion will not be interfered with unless it firmly appears that defendant's rights have been abused. *Edwards v. Rudowicz*, 368 S.W.2d 503 (Mo.App.1963). We rule this point against the defendant.

Judgment affirmed.

CLEMENS, P. J., and SMITH, J., concur.