# Richmond.

## RAYMOND (BUSTER) McDANIEL v. COMMONWEALTH OF VIRGINIA.

January 15, 1945.

Record No. 2904.

Present, All the Justices.

The opinion states the case.

*John D. Easley*, for the plaintiff in error.

*Abraham P. Staples, Attorney General*, and *M. Ray Doubles, Assistant Attorney General*, for the Commonwealth.

HOLT, J., delivered the opinion of the court.

Plaintiff in error, Raymond (Buster) McDaniel, on the 7th day of February, 1944, in the nighttime shot and killed Roy A. Alfred. He was indicted on March 13, 1944, for murder. There was a jury trial, which returned this verdict:

"We, the jury find the defendant guilty of murder in the first degree, as charged in this indictment, and fix his punishment at death."

It was approved by the trial court, which imposed the punishment fixed by the jury.

The accused is about thirty years old and is uneducated. He is the father of six children, one of whom is deficient. About six months before the commission of the crime

charged he moved to Altavista and went to work in the rayon plant there. Roy A. Alfred also worked there. He, too, is a married man with children.

Alfred was shot with a pistol. The bullet entered his chest an inch or more to the right of center, passed diagonally through the body, slightly downward and lodged under the left shoulder blade. Death followed instantly.

There is ample evidence in the record which the jury might have believed and which, if believed, tends to establish these facts:

Alfred's wife and McDaniel were cousins. These two men had once been friends. A path from McDaniel's home to the rayon plant led through the woods and near Alfred's house. Alfred told McDaniel not to come that way, and this because he got the impression that McDaniel was paying too much attention to his wife—enough for Alfred to say that if McDaniel didn't keep away from her he would put him under six feet of earth.

Mrs. Flossie Morris is McDaniel's sister. Another McDaniel brother had been hurt by a falling tree and was then in bed in the Morris home. On the afternoon of February 5th both Mrs. Alfred and McDaniel came to her house and at about the same time. Whether that was due to chance or to some prearrangement we do not know. The defendant said that it was by chance and that he came there to help nurse his brother. Both he and Mrs. Alfred spent the night there, remained over on the Sunday following and until Monday night. On Monday night, around eight o'clock, he took with him his nephew, Lewis Morris, a youth about fourteen years old, and started for his home, ostensibly to see about his wife who had been reported sick. He did not go to his home but sent ahead this nephew, who came back and told him that his wife was not sick but well. They then set out on a path which led by and in sight of the Alfred home. When in sight of it, McDaniel halted and sent his nephew ahead with instructions to give to Alfred any message which might be necessary to bring him out to where McDaniel stood. Lewis told Alfred that his wife was intoxicated and

at the Morris home.  Lewis then set out with Alfred follow-
ing him and was led by where McDaniel stood.  Lewis, in
passing, did not at first see McDaniel, who stood behind a
tree.  After Lewis had passed, McDaniel stepped out in
front of Alfred and said: "Stick 'em up!"  And at once
fired.  Lewis, turning, saw him fall.  At McDaniel's orders
he helped drag Alfred's body into the bushes and covered it
with leaves.  Later he helped carry the body over the rail-
road and hid it in some honeysuckle bushes.  Next day they
went to Lynchburg to see an uncle, Claude McDaniel, and
came back in Claude's car.  Tuesday night McDaniel came
for Lewis and got him out of bed; they went in this automo-
bile to where the body was hidden and took it to the Adams
farm, about seven miles away, and dumped it in an aban-
doned well.  At some time he took from the body a pocket-
book with twenty dollars in it, not since seen.

Roy Alfred, a ten-year-old son, said that when his mother
left home on said Saturday she said she was going to Aunt
Otter's, and that when Lewis came he told his father: "Your
wife's up there by the church, hurt.  She said for you to
come up and get her."  It was by this church that Lewis
left McDaniel when he went to the Alfred home.

After Alfred had been shot, Lewis and McDaniel came
back to the Morris home, stayed there an hour or two, and
left with Mrs. Alfred for the Alfred home.  According to
the evidence of Roy Alfred, Lewis and McDaniel came into
the Alfred home with Mrs. Alfred.  McDaniel and Mrs.
Alfred went into a backbedroom and stayed there for about
fifteen minutes or more.  Lewis said that they stayed there
quite a bit, and McDaniel said that they were there for
more than an hour but that they did not go into the back
bedroom.  When he came out, he and Lewis returned to the
Morris home.  Mrs. Alfred did not go with them.

Mr. Miles, who is sheriff of Campbell county, said that on
the 12th or 13th of that month McDaniel, after having been
duly cautioned, volunteered to give his account of this
tragedy:  He said that he sent Lewis to the Alfred home and
told him to tell Alfred something about his wife and to toll

him to where McDaniel stood. This went according to plan and after Lewis, returning, had passed where McDaniel stood and when Alfred was near, McDaniel said to him: "You have been threatening my life. Now, if you want to kill me, come on." And that Alfred then reached back—he thought to get his gun—whereupon he shot him. That they took the body to the railroad, put it in the ditch and covered it with vines; and on Tuesday night he and Lewis took the body in his brother Claude's car to an old abandoned well and dumped it in. He said that "he had been planning to do this for a long time or since Alfred had threatened his life." That he went back to the Morris home, got Mrs. Alfred and took her back to her own home, but that neither he nor his nephew Lewis went in. They thereupon returned to the Morris home and spent the balance of the night. He further said that Alfred went over to his home one day when Mrs. Alfred was there and told her that, if she kept on running after Buster McDaniel, he was going to put Buster under six feet of ground.

J. H. Barnes is a State police officer. He heard McDaniel say that he shot Alfred because he had been threatened and that once when Mrs. Alfred was at his home, Alfred came up and told her to leave, to go home and get her clothes and come back and stay with McDaniel if she wanted to; and that if he, McDaniel, didn't stop running around with his wife he would put him under six feet of ground. McDaniel himself had heard Alfred make no threats but was told of them by his mother and his small son. Barnes further said that McDaniel told him that he sent Lewis to Alfred's home and told him to tell Alfred something to get him away, down to where he was, and that he met Alfred as he was brought up by Lewis and told Alfred that he understood that he wanted to kill him and if he did so to go ahead and do it; that Alfred reached back towards his pocket, when he shot him. He further said that he went back to the Morris home, got Mrs. Alfred and took her to her home but that he did not go in the house with her and that ever since he had

heard of Alfred's threat "he had just been planning on how to take care of him."

The evidence of these two officers was objected to on the ground that the accused had signed a written confession, drafted by the attorney for the Commonwealth, and was in itself the best evidence of the extent of his confession.

The confession in evidence was an extrajudicial confession —voluntary and without pressure, after caution and after the *corpus delicti* had been established. 20 Am. Jur. sec. 480.

It was made in the presence of the sheriff, in the presence of a State police officer and in the presence of the Commonwealth's Attorney. It was afterwards put in writing, which is copied into the record.

"Oral Admission of Facts Contained in Written Instrument—There is some difference of opinion in the United States regarding the application of the best evidence rule to parol proof of admissions concerning writings. Many courts take the view that a party's oral admissions against his own interest are equally as competent as writings and constitute primary evidence against him, even though such admissions tend to prove the contents of the writing, or, in other words, the oral admissions of a party are evidence against himself although they relate to the contents of a formal written instrument in issue in the case. This has been the settled doctrine in England for many years. Many American courts, however, take the position that the declarations or admissions of a party cannot be substituted for record or written evidence and cannot be received without accounting for the absence of the writings." 20 Am. Jur. 379, sec. 425.

"Where a judicial confession has been committed to writing pursuant to legal requirement, the writing must be produced as the best evidence, unless its absence is accounted for. This rule, according to some authorities, also applies to an extrajudicial written confession. Other authorities, however, hold to the contrary, on the theory that the rules governing the admission of primary and secondary evidence to establish a contract have no application to confessions of this

character, although such rules are recognized as being applicable to a confession made on a hearing before a magistrate who reduces it to writing and makes it part of the record, pursuant to statute." 22 C. J. S. 1457.

The rule is thus stated in Section 409, Wharton's Criminal Evidence, Vol. 1 (11th Ed.) 652, where it is said:

■■ "Parol evidence equally primary with writing.—When the fact of which evidence is sought to be adduced is one that may have been observed by a witness, then his testimony regarding what he has seen or heard is primary evidence, regardless of whether such fact is reduced to writing and incorporated in a record or document; the witness testifies, not as to what the writing contains, but as to what he observed or knows."

To the same effect see Jones on Evidence, 4th Ed. 401; *Tyler* v. *State*, 159 Miss. 223, 131 So. 417; *People* v. *Giro*, 197 N. Y. 152, 90 N. E. 432, and *People* v. *Spencer*, 264 Ill. 124, 106 N. E. 219.

■ We are dealing here with something heard by witnesses. The fact that one of them afterwards reduced it to writing does not make the others incompetent. This is not a case in which by secondary evidence it is sought to prove the contents of a writing, which is itself, of course, the best evidence of what is there written. Here all this evidence is primary evidence, stemming from a common source. No Virginia cases deal directly with this question.

We are cited to these Virginia cases as supporting the defendant's contention.

In *Lunsford* v. *Smith*, 12 Gratt. (53 Va.) 554, it appears that a sheriff sold slaves under an execution. Of course that execution was primary evidence of his authority.

In *Marshall* v. *Commonwealth*, 140 Va. 541, 125 S. E. 329, a State prohibition officer and a deputy sheriff undertook to search the home of the accused. Their right to do that rested in a search warrant. Of course that warrant was itself the best evidence.

In *Butts* v. *Commonwealth*, 145 Va. 800, 133 S. E. 764, a man was charged with stealing money. If money taken

was wages due to him, he was not guilty. Money due to him was conditioned upon the time which he had worked and a time card was primary evidence.

In *Stacy* v. *Commonwealth*, 163 Va. 1033, 175 S. E. 723, conviction in part rested upon an anonymous letter. The court did not undertake to discuss the question of best and secondary evidence.

There was no error in the admission of this oral testimony as primary evidence. There was no error for another reason: The heart of the Commonwealth's case, in its prosecution for first degree murder, rests in the fact that the killing of Alfred was a part of a preconceived plan, long entertained. And that appears both in the written confession and in the oral evidence. Each was sufficient to sustain a conviction of first degree murder.

It is pertinent in this connection to note that the accused during a lengthy examination maintained that he shot Alfred in self-defense. His counsel urges that he was insane and claims that on that phase of the case the jury was not adequately instructed.

These facts bear upon the claim of self-defense:

Lewis said that when he brought Alfred back, McDaniel stepped out and said "Stick 'em up!" and shot him almost immediately. They then dragged the body out of the path and covered it with leaves. Afterwards they took it to the railroad and put it in a ditch and covered it with vines. Later they took it in an automobile to an abandoned well seven miles away and dumped it in. McDaniel claims that when he heard of Alfred's threats he became so alarmed that he armed himself with a pistol and would sometimes stay at his sister's house that he might not have to pass the Alfred home in the nighttime. In his testimony this appears:

"Why, if you were afraid of him, did you go out there in the middle of the night at this isolated spot in a lonely woods road to meet him, if you were afraid of him?

"A. He said he was going to kill me. I wanted, if he was going to kill me, not to get me in the hollow and

maybe knock me in the head and kill me behind my back or something. If he wanted to do it, I wanted him to do it. I didn't go behind his back.

"Q. You didn't go behind his back?

"A. No, sir."

And again:

"Q. You waited until that little boy had passed and then you stepped between him and this man Alfred, and you shot him without giving him an opportunity to say howdy do.

"A. I spoke, walked out to him—Yeah, I didn't want the boy,—One of us may have hurt him. I give him a chance to get out of the way."

Again he was asked, if his intentions were peaceful, why he didn't go to the Alfred home to see him and answered:

" * * * If I knowed I could have made it all right with him at his home. I didn't want to maybe go up and he haul up and aim to kill me and I have to kill him in his yard."

And again:

"Q. Did you have any idea why he didn't want you to use it (the path).

"A. No, sir, I did not.

"Q. Why didn't you ask him why?

"A. I told him if he wanted to stop me, to come on over and stop me.

"Q. You wanted him to come over and have a fight, didn't you?

"A. It didn't belong to him.

"Q. You told him if he thought he could stop you from walking the path, to come over and stop you.

"A. Yes, sir.

"Q. Did you mean by that to come over and have a fight with you?

"No, sir.

"Q. Did you stop going through there?

"A. I didn't stop. I kept going through."

McDaniel said that he was so terrified by Alfred's threat that he would sometimes sleep at his sister's home rather than go by the Alfred house. At another place he said: "I didn't figure where he had no right to stop me from walking either." Elsewhere he was asked: "Did you stop going through there?" And he answered: "I didn't stop. I kept going through."

If we are to believe him, he sent for Alfred to meet him in the nighttime, and when Alfred came he was told to "Stick 'em up!" He did not "stick 'em up," but reached back to his hip pocket for a non-existent weapon and was shot out of hand. It is an incredible tale.

His counsel would have us believe that he was insane. This is the evidence on that subject:

Fifteen years ago his head was hurt in an automobile accident, and he was kept in a hospital for two days, when he was discharged. Later his scalp was cut by a mule which kicked him.

A. J. McDaniel, his father, said that he was a good worker but that on one occasion he drove into the stable lot and didn't want to take the mules out to feed them. On another occasion he saw him going down the road with a rock in each hand and said that he was carrying them for protection, and he told his father that he would hit him with them if he troubled him. On another occasion he was seen doing shadow boxing and on that occasion he staggered as he went away. On another occasion he unloaded corn from his wagon in the middle of the road instead of taking it home. On another occasion he fell off a cornplanter and lay on the ground for awhile, then recovered and walked home. Again he said to another witness that Alfred had threatened his life and he was afraid to go home. Another

witness said he seemed to think that everybody was against him. There is evidence to the effect that he was irritable and at times manifested high temper.

Witness after witness testified that he was just an ordinary ignorant, unlettered farmhand. His examination covers fifty pages of the printed record and is about what might have been expected from such a witness. There is just no evidence of insanity upon which any verdict could have properly rested.

Next it is said that there was error in permitting the sheriff to testify in rebuttal. The defendant said that he was a good provider and cared for his family. In reply the sheriff said that there was no evidence of this in the home. There is no merit in the objection.

Objection is made to these instructions given at the instance of the Commonwealth—2, 5, 6, 7, 8, 9 and 13. All except 9 and 13 are objected to because there is not appended to each of them a statement dealing with insanity. 9 and 13 are stock instructions.

Since there was no evidence of insanity, these instructions should not have dealt with it. As a matter of fact, the court at the instance of the Commonwealth told the jury that the accused "must go further and prove to the satisfaction of the jury that he was insane or mentally irresponsible at the time of the commission of the crime." And at the instance of the defendant it told the jury "that the law presumes every man to be sane, and so far as the defense of insanity is concerned, the burden rests upon the defendant to prove to the satisfaction of the jury, but not beyond every reasonable doubt, that he was insane at the time of the killing. If the jury are so satisfied they should acquit the defendant on the ground of insanity and so state in their verdict; if the jury are not so satisfied, then they should not acquit on that ground."

The court further told the jury that these instructions should be read together and that is the law. *Bowman* v. *Commonwealth*, 174 Va. 461, 5 S. E. (2d) 497.

The practice of multiplying instructions has been con-

demned time and again. *Savage* v. *Nute*, 180 Va. 394, 23 S. E. (2d) 133.

Again the court was asked to set aside the verdict of the jury because it was contrary to the evidence and without evidence to support it. There is no merit in this assignment.

Finally, it is said that the jury was not kept together.

It appears that on the morning of the second day of the trial the jury was brought back from Lynchburg, where it had spent the night and was taken to "Ike's Place" to get a drink of Coca-Cola and was then taken across the street to the courthouse. One of the jurors, D. C. Elliott, while the others were in Ike's Place went into a single closet opening into the room where they were. The officers and jurors not having noted his absence went immediately to the courthouse and to the jury room. When Elliott came out of the closet and found the jury gone, he hurried to the courthouse. On the steps of the courthouse he inquired generally: "Which way did they go?" He was told and then hurried on to the jury room. He reached that room a few minutes late. The jurymen were not yet settled and some of them were hanging up their hats. When the jury was empanelled the judge cautioned them not to discuss this case with any one nor to allow any one to discuss it with them; not to permit others to discuss it in their presence and not to discuss it among themselves until all the evidence was in.

On the motion to set aside the verdict because of separation the judge examined each individual juror and examined all of the officers in charge of them and each answered that the admonition that had been given them in the beginning had been observed to the letter, with this single exception when Elliott hurried from the watercloset and reached the courthouse and inquired generally: "Which way did they go?"

"An extensive review of the cases decided before and since the last modification of the common law practice was made by Mr. Chief Justice Campbell in *Owens* v. *Commonwealth*, 159 Va. 1015, 167 S. E. 377, in which this is said,

at page 1022: 'We, therefore, lay down the rule that separation of the jury out of the custody and control of the court, or out of the custody and control of the officer to whom the jury has been legally committed, is merely *prima facie* sufficient to vitiate a verdict; and when it appears that there has been a separation of the jury, the burden is upon the Commonwealth to refute the presumption by disproving, beyond a reasonable doubt, all probabilities or suspicions of tampering, and that the prisoner has not been prejudiced thereby, unless the prisoner's own proof should be sufficient to that end.'" *Robinson* v. *Commonwealth*, 182 Va. 42, 28 S. E. (2d) 10.

Beyond the shadow of perhaps, the jury has not been tampered with and the prisoner has not been prejudiced.

Independent of all instructions and of every incident which occurred during the trial, no other judgment could properly have been entered. Alfred was killed deliberately and in accordance with a plan long thought out.

*Affirmed.*