Present:  All the Justices

BRIAN LEE CHERRIX

OPINION BY JUSTICE ELIZABETH B. LACY

v.  Record Nos. 981798 & 982063      February 26, 1999

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF ACCOMACK COUNTY
Glen A. Tyler, Judge

In this appeal, we review the capital murder conviction and death penalty imposed upon Brian Lee Cherrix, along with his convictions for forcible sodomy, two counts of using a firearm in the commission of a felony, and possessing a firearm after being convicted of a felony.

## I.  Facts

On the night of January 27, 1994, 23 year-old Tessa Van Hart was working as a pizza delivery person at a pizza delivery restaurant on Chincoteague Island.  A man telephoned the restaurant and ordered a pizza to be delivered to an address in the "Small Piney Island" area of Chincoteague. Around 7:45 p.m., Van Hart left the restaurant to deliver the pizza.

When Van Hart failed to return from the delivery, the Chincoteague police were notified, and they began a search for Van Hart.  Shortly after midnight on January 28, the police found Van Hart's vehicle behind a vacant home approximately

one mile from the Small Piney Island area.  Van Hart's body was found in the back seat.

An autopsy revealed that Van Hart died from two gunshot wounds to the head.  The autopsy also showed that she had been sodomized and had suffered bruises and abrasions on her forehead, cheek, nose, and mouth sometime around the time of death.  In the yard of the house to which Van Hart was to have delivered the pizza on January 27, the police found two bloodstains which DNA typing showed to be consistent with Van Hart's blood.

The murder of Tessa Van Hart remained unsolved for over two years.  On June 3, 1996, however, Brian Lee Cherrix, who was in the Accomack County Jail pending sentencing on unrelated charges, contacted the Accomack County Sheriff, Robert Crockett.  Cherrix said that he had information concerning the Van Hart murder that he would share with police in return for leniency on his pending sentencing.  Cherrix told Crockett that his cousin, Robert Birch, III, had killed Van Hart.  Cherrix claimed that Birch had told him in February 1994 that he, Birch, had lured Van Hart to an unoccupied residence by ordering a pizza, raped and shot her, and then discarded the rifle used in the crime in a nearby creek. Birch died in 1995.

The state police began an underwater search of the creek for the murder weapon. When Cherrix was informed that the dive team had not recovered the rifle, he agreed to go to Chincoteague to show the officers the location of the rifle according to what Birch supposedly had told him. At the search site, Cherrix directed Trooper Mark Fowler to the place he claimed that Birch had told him he had thrown the rifle. Fowler testified at trial that, while Cherrix maintained that he was only relating facts imparted to him by Birch, Cherrix would occasionally lapse into the use of the first person in describing how and where the rifle came to be located in the creek. The divers recovered a .22 caliber Marlin rifle at the location indicated by Cherrix.

Later that same day, Cherrix was taken to the City of Chesapeake, where he was interviewed by state police investigator Lloyd Dobbs. After being advised of his Miranda rights and signing a written waiver of those rights, Cherrix gave several differing versions of the story Birch supposedly had told him, all the while using hand and arm gestures to demonstrate how Birch supposedly had disposed of the rifle. Sheriff Crockett then took Cherrix back to Accomack County Jail.

Although Birch had died in 1995, the police conducted an investigation of his whereabouts on the night of the murder,

3

and they concluded that he was not a suspect in the Van Hart murder. In August 1996, after having been sentenced on unrelated charges to 20 years imprisonment with all but nine years suspended, Cherrix was transferred to the custody of the Virginia Department of Corrections to serve his sentence.

On April 16, 1997, Cherrix was returned to Accomack County Jail on charges of uttering and grand larceny. During the drive from Brunswick Correctional Center to the Accomack County Jail, Chincoteague Assistant Police Chief Edward Lewis interviewed Cherrix regarding the Van Hart murder. After Lewis advised Cherrix of his Miranda rights and Cherrix agreed to discuss the matter, Cherrix told Lewis yet a different version of what he claimed had happened on the night of the murder, still maintaining that Birch had committed the murder.

On April 17, 1997, counsel was appointed for Cherrix's uttering and grand larceny charges. On April 25, 1997, Cherrix submitted a written request to the Accomack County Jail authorities asking to see Lewis. Lewis went to the jail to see Cherrix. After Lewis advised Cherrix of his Miranda rights and Cherrix reaffirmed that he wanted to speak with Lewis, Cherrix confessed to the murder and sodomy of Van Hart. Cherrix then accompanied Lewis and an Accomack County sheriff's deputy to Chincoteague, where he directed the

4

officers on a tour of various locations that he had described in his confession.

## II.  Proceedings

Cherrix was indicted for capital murder, forcible sodomy, two counts of using a firearm in the commission of those offenses, and one count of being a felon in possession of a firearm.  Code §§ 18.2-31, -67.1, -53.1, and -308.2.  At the conclusion of the guilt stage of a bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, the jury convicted Cherrix on all counts.

After hearing evidence on the issue of punishment, the jury sentenced Cherrix to death for the capital murder, life imprisonment for the forcible sodomy, a total of eight years for using a firearm in the commission of those offenses, and five years for possessing a firearm after being convicted of a felony.  Cherrix's death sentence was based upon the jury's finding of both "future dangerousness" and "vileness."  See Code § 19.2-264.4.  The trial court reviewed the presentence report and victim impact statements and imposed all of the sentences fixed by the jury.

Cherrix appeals his capital murder conviction, Record No. 981798.  We have certified Cherrix's appeal of his non-capital convictions from the Court of Appeals, Record No. 982063, and have consolidated the two appeals.

5

### III. Issues Previously Decided

Cherrix filed a pre-trial motion asking the trial court to declare the Virginia death penalty statutes unconstitutional on a number of grounds. He also filed pre-trial motions asking the trial court to allow the use of a jury questionnaire, to allow individual sequestered voir dire, and to supplement the trial court's voir dire with questions submitted by defense counsel in order to ascertain possible juror bias necessary to empanel an impartial jury.[1] He now appeals the trial court's denial of those motions, raising issues that we have considered and rejected in previous cases:

(1) Virginia's two statutory aggravating circumstances of "future dangerousness" and "vileness" are not unconstitutionally vague. Beck v. Commonwealth, 253 Va. 373, 387, 484 S.E.2d 898, 907, cert. denied, ___ U.S. ___, 118 S.Ct. 608 (1997)("vileness"); Clagett v. Commonwealth, 252 Va. 79, 86, 472 S.E.2d 263, 267 (1996), cert. denied, 519 U.S. 1122 (1997)("future dangerousness").

(2) Virginia's penalty-stage instructions adequately inform the jury regarding the concept of "mitigation." Swann

---

[1] The trial court actually granted Cherrix's request for individually sequestered voir dire, but limited its inquiry to the issues of "publicity and whether a juror would consider the death penalty."

v. Commonwealth, 247 Va. 222, 228, 441 S.E.2d 195, 200, cert. denied, 513 U.S. 889 (1994).

(3) The use of unadjudicated conduct to prove "future dangerousness" without proof of such conduct beyond a reasonable doubt is not unconstitutional. Goins v. Commonwealth, 251 Va. 442, 453, 470 S.E.2d 114, 122, cert. denied, 519 U.S. 887 (1996).

(4) Allowing, but not requiring, a trial judge to reduce a sentence of death to life imprisonment on a showing of "good cause" is not unconstitutional. Breard v. Commonwealth, 248 Va. 68, 76, 445 S.E.2d 670, 675, cert. denied, 513 U.S. 971 (1994).

(5) Consideration of hearsay evidence or information in a presentence report during the sentencing phase of a capital murder case is not unconstitutional. Goins, 251 Va. at 453, 470 S.E.2d at 122; O'Dell v. Commonwealth, 234 Va. 672, 701-02, 364 S.E.2d 491, 507-08, cert. denied, 488 U.S. 871 (1988).

(6) The review provided by this Court on direct appeal in capital cases is not unconstitutional. Mickens v. Commonwealth, 252 Va. 315, 320, 487 S.E.2d 302, 306 (1996), cert. denied, 520 U.S. 1269 (1997).

(7) Capital murder defendants do not have the constitutional right to individual and sequestered voir dire

of prospective jurors.  Stewart v. Commonwealth, 245 Va. 222, 229, 427 S.E.2d 394, 399, cert. denied, 510 U.S. 848 (1993).

(8)  Capital murder defendants do not have the constitutional right to require the trial court to mail a questionnaire to all potential jurors.  Strickler v. Commonwealth, 241 Va. 482, 489-90, 404 S.E.2d 227, 232, cert. denied, 502 U.S. 944 (1991).

We find nothing in Cherrix's arguments here that warrants a change in our previous positions.

## IV.  Pre-Trial Issues

### A.  Failure to Suppress Cherrix's Confession

Prior to trial, Cherrix filed a motion asking the trial court to suppress all of his statements to the police "on or after June 7, 1996, in that on each and every occasion the statements secured from the defendant, if any, were obtained while the defendant was in custody and denied his right to counsel."

At the suppression hearing, Cherrix testified that he requested counsel in the presence of Sheriff Crockett on the return trip from Chesapeake to Accomack on June 7, 1996, and that he invoked his right to counsel when he was being interrogated by Lewis on the trip from Brunswick Correctional Center to Accomack County Jail on April 16, 1997.  He admitted that he had asked to speak with Lewis on April 25, but he

denied that Lewis advised him of his Miranda rights before interrogating him on that date.

Sheriff Crockett testified that, while in Chesapeake on June 7, 1996, Cherrix had been advised of his Miranda rights and that he signed a written waiver. He also testified that Cherrix never invoked his right to counsel or his right to remain silent during the return trip to Accomack.

Lewis testified that on April 16, 1997, he advised Cherrix of his Miranda rights, and that Cherrix elected to speak to him. He denied that Cherrix, "at any time . . . on April 16," requested counsel or otherwise indicated that he wished to stop answering questions. Finally, Lewis testified that when he went to see Cherrix at the Accomack County Jail on April 25 pursuant to Cherrix's request, he again advised Cherrix of his Miranda rights, and that Cherrix never indicated on that date that he wished to have counsel present or that he wished to stop answering questions.

Following the suppression hearing, the trial court denied Cherrix's motion to suppress his confession. On appeal, Cherrix claims that he clearly invoked his right to counsel on April 16, that interrogations nevertheless continued without counsel being provided, in violation of his Fifth Amendment rights, and that the statements he made during those interrogations were thus inadmissible. See Miranda v.

9

Arizona, 384 U.S. 436 (1966); Edwards v. Arizona, 451 U.S. 477 (1981).[2] Cherrix contends that the trial court's denial of his motion to suppress the confession therefore constituted reversible error. We do not agree.

Admissibility of a defendant's statements is an issue to be decided by the trial court, which evaluates the credibility of the witnesses, resolves any conflicts in the testimony, and weighs the evidence as a whole. Watkins v. Commonwealth, 229 Va. 469, 477, 331 S.E.2d 422, 429 (1985), cert. denied, 475 U.S. 1099 (1986). Before admitting statements made by a defendant during custodial interrogation, the trial court must determine whether the defendant knowingly and intelligently relinquished and abandoned his rights. See id. The trial court's determination is the resolution of a question of fact based on the totality of the circumstances, Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Watkins, 229 Va. at 477, 331 S.E.2d at 430, and will not be disturbed on appeal unless

_____

[2] Although Cherrix does not explicitly argue that the admission of his confession violated his Sixth Amendment right to counsel, he does make repeated references to the fact that counsel had been appointed to him on unrelated charges prior to his being interrogated on April 25. However, as the Commonwealth points out, the Sixth Amendment right to counsel is charge-specific and does not "travel with a defendant and attach [itself] to any other crimes . . . ." Eaton v. Commonwealth, 240 Va. 236, 252, 397 S.E.2d 385, 394 (1990), cert. denied, 502 U.S. 824 (1991).

10

plainly wrong.  Jones v. Commonwealth, 228 Va. 427, 441, 323 S.E.2d 554, 561 (1984), cert. denied, 472 U.S. 1012 (1985).

Here, the record supports the trial court's admission into evidence of Cherrix's statements to the police.  Lewis testified unequivocally that he read Cherrix his Miranda rights on April 16 and April 25, and that Cherrix never asked for counsel on either date.  Cherrix testified to the contrary; however, the trial court was in a position to evaluate the credibility of witnesses and its decision to accept Lewis' testimony and reject Cherrix's testimony is amply supported by the record.  See Watkins, 229 Va. at 477, 331 S.E.2d at 430.

### B.  Failure to Disclose Exculpatory Material

Prior to trial, the trial court accepted the Commonwealth's assertion that all discovery requirements had been satisfied and declined to rule on Cherrix's motion for discovery.  At that time, the Commonwealth had a written statement from Cherrix's grandmother asserting that Cherrix was at home on the night of Van Hart's murder and that he placed a telephone call to his wife "around 8:00 o'clock or so."  The Commonwealth had not disclosed this written statement to Cherrix.

At trial, Cherrix's grandmother testified as an alibi witness for him and stated that Cherrix placed a telephone

11

call to his wife at 8:15 on the night of the murder and that the call went on "a long while." On cross-examination, she testified that she had been interviewed by a police officer, but that she could not remember what she told the officer. The Commonwealth subsequently called the interviewing officer as a rebuttal witness and asked him to read the statement signed by Cherrix's grandmother. Cherrix objected to the admission of the statement, asserting that it contained exculpatory material which should have been disclosed by the Commonwealth prior to trial. See Brady v. Maryland, 373 U.S. 83 (1963). The trial court overruled Cherrix's objection and admitted the written statement.

On appeal, Cherrix asserts that his knowledge of the information contained in the statement does not excuse the Commonwealth's failure to disclose the statement, but shows a lack of good faith and violates the due process clause under Brady. We disagree.

The disclosure requirement imposed by Brady applies to material exculpatory evidence. Exculpatory evidence is material if there is a reasonable probability that the outcome of the proceeding would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 682 (1985); Robinson v. Commonwealth, 231 Va. 142, 151, 341 S.E.2d 159, 164 (1986). In calling his grandmother

12

as an alibi witness, Cherrix demonstrated that he and his counsel knew about and relied upon her testimony regarding his presence at home on the night of the murder and the telephone call he made to his wife. The content of her written statement was, as he admits, "reasonably known" and "consistent with the defense case."

The written statement of the grandmother's testimony did not change the substance of the information known to the defense, and the failure to disclose the fact that she had executed a written version of her testimony did not deprive Cherrix of material exculpatory information in violation of Brady. See Castillo v. Johnson, 141 F.3d 218, 223 (5th Cir.), cert. denied, ___ U.S. ___, 119 S.Ct. 28 (1998)(prosecution has no obligation to produce information already known to defense). Accordingly, the trial court did not err in overruling Cherrix's objection and admitting the statement into evidence.

**V. Guilt Phase**

A. Reading and Admission of Statement

During the Commonwealth's direct examination, Lewis related the oral confession Cherrix made during their April 25 conversation. Lewis then testified that he briefly left the room after Cherrix made the oral confession, with the expectation that Cherrix would write out and sign a written

13

confession. When Lewis returned, however, Cherrix had not done so.

Lewis testified that he then initiated "a question and answer session" with Cherrix, in which he asked Cherrix several questions concerning the murder, wrote down each question as he had asked it, and then wrote down Cherrix's response to each question "word for word." Lewis testified that he then read Cherrix's answers back to him, and that Cherrix acknowledged the accuracy of each written response before Lewis would proceed to the next question. When all the questions and answers were complete, Lewis asked Cherrix to sign the document, but Cherrix refused.

After Lewis testified about the procedure used in the "question and answer session," he then proceeded to read each question and answer to the jury. Cherrix objected, taking the position that, because the "question and answer" document was not signed, it was "nothing more than a continuing oral statement at which time the officer may have taken notes." Cherrix asserted that since the document was merely Lewis' notes of the conversation, Lewis should only be permitted to refer to it to refresh his recollection, but not to read directly from it.

The trial court overruled Cherrix's objection and permitted Lewis to read each question and answer. Cherrix

14

then raised an objection to the admission of the document into evidence as an exhibit, but the trial court deferred ruling until after Lewis finished testifying. The Commonwealth moved to admit the document following Lewis' direct examination, and the trial court again deferred its ruling pending cross-examination of Lewis by the defense. The record bears no indication that the document was thereafter admitted as an exhibit; however, the document was made a part of the record because Cherrix attached it to a post-trial motion.

On appeal, Cherrix renews his argument that the "question and answer" document is merely Lewis' notes. He asserts that a document must be admitted into evidence as an exhibit if it is to be read to the jury by a witness, and that the only exception to this rule is the hearsay exception of "past recollection recorded." Cherrix concludes that, because the Commonwealth did not meet the foundational requirements for introduction of "past recollection recorded" material, the trial court erred by permitting Lewis to read from the "question and answer" document. We disagree.

Contrary to Cherrix's assertion that the "question and answer" document represented Lewis' notes, the trial court found that the document represented Cherrix's own statements:

> [I]n all of the other statements that have come
> in in this case, they have been statements that
> were oral and that were testified to by the

15

> witness primarily from memory with him from time to time referring to notes to refresh his recollection, but in this case it is a very different set of circumstances. The witness has stated that he specifically referred – that he specifically wrote out a question. Specifically asked a question. Specifically wrote down *word for word* the answer and reviewed it with the defendant. . . .

(Emphasis added.) As characterized by the trial court, then, the "question and answer" document was elevated to the status of a written confession.

There can be no question but that a written confession is admissible into evidence. Confessions, whether oral or written, are admissible against a criminal defendant under the "party admission exception" to the hearsay rule. Quintana v. Commonwealth, 224 Va. 127, 148, 295 S.E.2d 643, 654 (1982), cert. denied, 460 U.S. 1029 (1983); Land v. Commonwealth, 211 Va. 223, 229, 176 S.E.2d 586, 590-91 (1970). This is true even if the written confession is unsigned, as long as the defendant understood and adopted its substance. Wong Sun v. United States, 371 U.S. 471, 491 (1963)("The fact that the statement was unsigned, whatever bearing this may have upon its weight and credibility, does not render it inadmissible"). Because the "question and answer" document was admissible as a confession, the failure of the Commonwealth to lay a foundation for its admission under the "past recollection recorded" exception is irrelevant.

16

Although the "question and answer" document could have been admitted into evidence as an exhibit and would have been the best evidence of Cherrix's confession, see McDaniel v. Commonwealth, 183 Va. 481, 32 S.E.2d 667 (1945), Cherrix objected to its admission as an exhibit at trial. Therefore, he cannot now argue that the trial court erred in allowing the confession to be admitted in secondary form – through Lewis' reading it into evidence. For these reasons, there was no error in the trial court's decision to permit Lewis to read from the "question and answer" document during his testimony.

### B. Motion to Set Aside the Verdict

Cherrix argues that the trial court erred in denying his motion to set aside the verdict as contrary to the law and evidence because the Commonwealth failed to prove the corpus delicti beyond a reasonable doubt. We disagree.

In every criminal prosecution, the Commonwealth must prove the element of corpus delicti, that is, the fact that the crime charged has been actually perpetrated. Maughs v. City of Charlottesville, 181 Va. 117, 120, 23 S.E.2d 784, 786 (1943). Further, if the accused has fully confessed that he committed the crime, then only slight corroboration of the confession is required to establish corpus delicti beyond a reasonable doubt. Jackson v. Commonwealth, 255 Va. 625, 646, 499 S.E.2d 538, 551 (1998).

Cherrix was charged with capital murder, forcible sodomy, use of a firearm in the commission of those offenses, and being a felon in possession of a firearm. Cherrix fully confessed to having committed these crimes, and the record reveals that the Commonwealth produced considerably more than slight evidence to corroborate Cherrix's confession.

As discussed above, Van Hart's dead body was found with two .22 caliber gunshot wounds to the head. The autopsy revealed recent penetration of the anus and signs of blunt force trauma to the head shortly before death. This evidence sufficiently corroborates Cherrix's statements that he sodomized Van Hart and shot her to death.

Furthermore, Christopher Fox, an acquaintance of Cherrix, identified the .22 caliber rifle found by the police, at the exact location indicated by Cherrix, as the rifle Fox had sold to Cherrix. Cherrix's former wife also identified the rifle as one Cherrix once owned. The Commonwealth also established that Cherrix was a convicted felon at the time of the offense. This evidence sufficiently corroborates the commission of the firearm offenses. Accordingly, the trial court did not err in denying Cherrix's motion to set aside the verdict.

## C. Jury Instructions

At the conclusion of the guilt stage of the trial, Cherrix proffered the following jury instruction:

18

If you believe that Brian Lee Cherrix did not freely
and voluntarily give a statement to law enforcement
officers concerning his alleged involvement in the
sodomy and murder of Tessa Van Hart, then you may
give any such statement as much or as little
credibility as you deem appropriate.

The credibility and weight of any statements
presented to the jury as having been made by the
defendant are submitted for your consideration along
with all the other evidence.  The weight, the
credibility, the sufficiency are questions for
determination by you the jury.

The trial court granted the second paragraph of the
instruction but refused to grant the first paragraph on the
ground that there was no evidence to support a conclusion by
the jury that Cherrix's statements to police were involuntary.
The trial court also granted a "general" instruction, advising
the jury of its role in assessing the credibility of witnesses
and the weight of evidence.

On appeal, Cherrix claims that a general instruction on
credibility was insufficient to properly inform the jury of
their role in assessing the voluntariness of Cherrix's
confession, and that, therefore, the trial court erred in
refusing his instruction regarding the voluntariness of his
statements to police.  After reviewing the record, however, we
find no error in the trial court's denial of Cherrix's
proffered instruction.

While it is true that the trial court's pre-trial
determination that a defendant's statements are admissible in

19

evidence does not preclude the defendant from proving at trial that those statements were made involuntarily, see Jackson v. Commonwealth, 193 Va. 664, 674, 70 S.E.2d 322, 328 (1952)("Admissibility of confession is for trial court but its weight and value are for the jury."), it is also well established that a defendant is not entitled to a jury instruction unless it is supported by more than a scintilla of evidence.  Commonwealth v. Donkor, 256 Va. 443, 445, 507 S.E.2d 75, 76 (1998).

Cherrix testified at a pre-trial suppression hearing that the police had violated his Miranda rights; however, he elected not to testify at trial, and the evidence presented to the jury was undisputed that Cherrix's statements to police were preceded by voluntary and intelligent waivers of those rights.  Furthermore, the trial court not only gave a "general" instruction on the jury's role in assessing credibility, but also granted the instruction contained in the second paragraph above, which specifically relates to the weight and credibility of statements "having been made by the defendant."  Accordingly, we conclude that the jury was adequately apprised of its role, and that the trial court properly refused Cherrix's proffered instruction.

## VI.  Sentencing Phase

### A.  Mental Health Expert

20

Cherrix argues that the trial court erred in denying him an adequate and competent mental health expert, as required by Code § 19.2-264.3:1. That statute provides, in relevant part:

> The mental health expert appointed pursuant to this section shall be (i) a psychiatrist, . . . who has successfully completed forensic evaluation training as approved by the Commissioner of Mental Health, Mental Retardation and Substance Abuse Services and (ii) qualified by specialized training and experience to perform forensic evaluations. The defendant shall not be entitled to a mental health expert of the defendant's own choosing . . . .

Code § 19.2-264.3:1(A). Cherrix claims that Dr. John Bulette, the expert appointed by the trial court, did not possess the qualifications required by the statute. Because the record shows that Dr. Bulette was qualified under the statute, however, we find no error in the trial court's appointment.[3]

Cherrix filed a motion, pursuant to the statute, requesting the appointment of a defense expert to assist him in the capital sentencing phase of the trial. At a subsequent hearing, Cherrix informed the trial court that he had inquired into available experts, that he had "selected" Dr. Leigh Hagan of Chesterfield County, and that he wanted the trial court to appoint Dr. Hagan.

---

[3] On appeal, Cherrix implies that the trial court's action denied him rights under the United States Constitution. See Ake v. Oklahoma, 470 U.S. 68 (1985). To the extent that he attempts to make this argument, however, it is defaulted because he did not object to Dr. Bulette's appointment on any

The trial court subsequently informed counsel by telephone that it had decided not to appoint Dr. Hagan because of the distance between Chesterfield County and Accomack County, and that it would instead appoint a local psychiatrist, Dr. John Bulette.  Without any objection, the trial court then entered an order appointing Dr. Bulette.

Two days later, Cherrix filed a motion to reconsider the matter and to appoint Dr. Hagan rather than Dr. Bulette, which motion the trial court denied.  At the hearing on that motion, Cherrix conceded that Dr. Bulette was a psychiatrist who had successfully completed his forensic evaluation training.  He contended, however, as he does now on appeal, that because Dr. Bulette had never before been involved in a capital murder case, he was not "qualified by specialized training and experience to perform forensic evaluations," as required by the statute.

Contrary to Cherrix's interpretation of Code § 19.2-264.3:1(A)(ii), however, the statute does not require experience in capital murder cases as a qualification for an appointed expert.  The relevant part of that statute simply requires specialized training and experience to perform forensic evaluations.  The trial court was familiar with Dr.

---

constitutional basis at trial.  Rule 5:25.  Therefore, we address only his statutory argument.

22

Bulette's background and specifically found that Dr. Bulette had "substantial experience" in such evaluations. Cherrix does not argue that Dr. Bulette lacked the training and experience expressly required by the statute, and we decline his invitation to graft onto the statute the additional requirement of experience in capital murder cases. Accordingly, we find no error in the trial court's appointment of Dr. Bulette.

## B.  Corrections Expert and Witnesses

Cherrix sought to present evidence regarding prison life and its effect on his "future dangerousness" through the testimony of an expert penologist, several Virginia corrections officials, a criminologist, a sociologist, and an individual serving a life sentence in the custody of the Virginia Department of Corrections.  The trial court initially granted Cherrix's motion for the appointment of an expert penologist pending submission of a report and cost estimate. The Commonwealth objected to the issuance of a subpoena for the inmate and moved to quash the subpoenas issued for the corrections officials, criminologist, and sociologist.

Following a hearing at which Cherrix proffered the testimony of these witnesses, the trial court determined that Cherrix's evidence was immaterial as mitigation evidence and therefore refused to compel the witnesses' attendance through

23

subpoenas.  The trial court vacated its prior order granting Cherrix's motion for appointment of an expert on the basis that the report was not timely filed, the cost estimate was high, and the proffered testimony of the expert, like the proffered testimony of the other witnesses sought, was immaterial.

Cherrix argues that the trial court erred because Code § 19.2-264.4 allows presentation of mitigating evidence.  He contends that exclusion of his proffered "mitigation evidence" was an abuse of discretion and violated his federal constitutional rights as established in Skipper v. South Carolina, 476 U.S. 1 (1986), and Eddings v. Oklahoma, 455 U.S. 104 (1982).  We disagree.

Although the United States Constitution guarantees the defendant in a capital case a right to present mitigating evidence to the sentencing authority, it does not limit "the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense."  Lockett v. Ohio, 438 U.S. 586, 605 n.12 (1978).  Code § 19.2-264.4(B) vests the trial court with the discretion to determine, subject to the rules of evidence governing admissibility, the evidence which may be adduced in mitigation of the offense.

Coppola v. Commonwealth, 220 Va. 243, 253, 257 S.E.2d 797, 804 (1979), cert. denied, 444 U.S. 1103 (1980).

The record shows that the evidence Cherrix sought to introduce involved the general nature of prison life. The inmate's proffered testimony sought to establish, based on the inmate's personal prison experience, what prison life would be like for Cherrix if he received a life sentence. The officials from the Department of Corrections would have testified regarding the ability of the penal system to contain Cherrix and the cost to the taxpayers of an inmate's life sentence. Cherrix's counsel stated that the testimony of the expert penologist, the sociologist, and the criminologist would be similar to that of the inmate and corrections officials. As the trial court observed, none of this evidence concerns the history or experience of the defendant.[4] We agree with the conclusion of the trial court that "what a person may expect in the penal system" is not relevant mitigation evidence. Accordingly, we will affirm the judgment of the trial court excluding this evidence.

### C. Post Trial-Offense Convictions

---

[4] Contrary to Cherrix's assertion, none of the evidence proffered at trial addressed Cherrix's ability to conform or his experience in conforming to prison life, as the defendant's evidence did in Skipper, 476 U.S. at 4.

25

Cherrix filed a pre-trial motion to exclude from the sentencing phase of the trial evidence of crimes he committed after he committed the capital offense in January of 1994. The trial court declined to rule on the motion because it was premature. During the sentencing phase, the Commonwealth offered as evidence two convictions that Cherrix received after January 1994. We have already stated on two prior occasions that evidence of "prior history" to establish future dangerousness under Code § 19.2-264.4(C) encompasses the time after which the subject offense was committed, Joseph v. Commonwealth, 249 Va. 78, 88-89, 452 S.E.2d 862, 869, cert. denied, 516 U.S. 876 (1995), and includes a defendant's most recent history, Saunders v. Commonwealth, 242 Va. 107, 117, 406 S.E.2d 39, 45, cert. denied, 502 U.S. 944 (1991). Accordingly, the trial court's admission of this evidence was proper.

D. Failure to Properly Advise Jury on Parole Eligibility

Cherrix contends that the trial court erred in failing to properly advise the jury of his eligibility, or lack thereof, for parole. He claims that, because "future dangerousness" was relevant to his sentencing, the trial court erred in failing to inform the jury that Cherrix "would effectively never be paroled." The record reveals, however, that Cherrix

26

has waived this argument for failure to object in the trial court.  Rule 5:25.

At the sentencing phase of the trial, Cherrix did not offer a parole eligibility instruction.  The issue of parole eligibility did not arise until the jury foreman inquired of the trial court, during deliberations, whether a life sentence would include the possibility of parole.  The trial court then suggested to counsel that it should "instruct the jury that they are to have no concern with parole."  When the trial court then asked Cherrix for his position on the matter, Cherrix responded, "I would suggest that the court instruct the jury as you have indicated.  [The jury] should not be concerned with parole . . . ."  The trial court subsequently instructed the jury that it "must decide whether to impose a life sentence or the death penalty based upon the evidence and the instructions that you have received and you are to give no consideration to the issue of parole."  Cherrix's failure to proffer a parole eligibility instruction and his failure to object to the trial court's instruction in response to the jury's inquiry mentioned above precludes us from addressing the merits of this assignment of error.

### E.  Aggravating Factors

A penalty of death may be imposed only if the Commonwealth proves, beyond a reasonable doubt, that the

27

defendant would commit criminal acts of violence that would be a continuing serious threat to society or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or aggravated battery.  Code § 19.2-264.4(C).  In this case, the Commonwealth sought the death penalty based on both of the aggravating factors, future dangerousness and vileness. The jury returned a sentencing verdict making the required findings under both factors.  Cherrix contends that the death penalty should not have been imposed because it was "unreasonable" for the jury to conclude that Cherrix would be a continuing serious threat to society, and because the Commonwealth failed to prove that his actions in committing the crime were outrageously or wantonly vile, horrible, or inhuman as that term is defined by the statute.  We disagree.

### 1.  Future Dangerousness

Cherrix argues that because the jury was fully informed of Cherrix's sentences for other crimes, it "could reasonably expect" that Cherrix had "at best" a "remote" chance of ever being released.  Thus, asserts Cherrix, any danger Cherrix might pose would be to the society within the prison, and a "five-foot-four inch, small framed, light weight man does not represent a danger to fellow inmates or guards."

28

Not only is this argument based primarily on speculation, it ignores the substantial evidence in the record of Cherrix's continuing assaultive behavior for which he expressed little remorse. Cherrix had a lengthy record of criminal convictions including assault and battery, malicious wounding, and use of a firearm. Furthermore, after the murder of Van Hart, Cherrix shot his half-brother and, according to his own mental health expert, had no remorse for the shooting. Cherrix had a similar lack of remorse after he broke his mother-in-law's arm with a pool cue. Cherrix told his mental health expert that he "would say anything to obtain his goals." His expert testified that Cherrix had an anti-social personality, was "angry with women," and acted out this anger by assaulting them. Finally, there is nothing in the record regarding Cherrix's ability to conform to prison life and work productively in that environment.

Our review of the record fully supports the jury's determination that Cherrix would constitute a continuing serious danger to society.

## 2. Vileness

The jury verdict found Cherrix's conduct in committing the crime "outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind . . . ." Cherrix argues that the record fails to support this finding

because there was no showing of depravity of mind beyond that inherent in ordinary legal malice and premeditation, and because there was no torture in that Van Hart died almost instantaneously. Again we disagree.

The events surrounding the murder show that Cherrix carefully planned his crime and lured his victim to a remote area. According to the defendant's recitation of events, after forcing her at gun point to partially disrobe and lie on the ground, he forcibly sodomized her while holding a rifle to the back of her head. Even though she "begged [him] not to kill her" and promised that she would "act like this never happened," he stood over her and shot her in the head for fear that "she was going to tell on [him]." Not sure that the first shot killed her, he "shot her again to make sure."

After the murder, Cherrix drove around with the victim's body in the car, considered going to a restaurant for a beer, and ultimately abandoned the car and victim at a deserted site and tossed the murder weapon in a creek. He then went home and called his wife at the hospital "like nothing ever happened." Cherrix visited the funeral home to view his victim's body and told the police that she looked "beautiful."

This evidence supports the jury's determination that Cherrix's conduct in committing the sodomy and murder

30

constituted torture of Van Hart or reflected depravity of mind.

## VII. Statutory Review

Code § 17.1-313(C) requires this Court to consider whether the sentence of death was imposed "under the influence of passion, prejudice or any other arbitrary factor," and whether such sentence is excessive or disproportionate to penalties imposed in similar cases, "considering both the crime and the defendant."  As to our first consideration, Cherrix asserts that the death penalty was imposed under the influence of passion, prejudice, or some other arbitrary factor because the jury improperly found the aggravating factors of future dangerousness and vileness.  However, we have already determined that these jury findings were supported by the record.  Our review of the record reveals no support for the proposition that the jury imposed the death sentence as a result of passion, prejudice, or any other arbitrary factor.

In considering whether the sentence imposed in this case is excessive or disproportionate to other sentences imposed for similar crimes, we compare the record in this case with records in other capital murder cases, including those in which life sentences have been imposed.  Since the jury based its death sentence on both the future dangerousness and

31

vileness predicates, we give particular consideration to other capital murder cases in which the death penalty was sought based on both predicates.

When considering the penalty for convictions of capital murder based on premeditated murder and rape/forcible sodomy, juries in this Commonwealth have generally, although not without exception, imposed the death sentence. Barnabei v. Commonwealth, 252 Va. 161, 477 S.E.2d 270 (1996), cert. denied, 520 U.S. 1224 (1997); Clozza v. Commonwealth, 228 Va. 124, 321 S.E.2d 273 (1984), cert. denied, 469 U.S. 1230 (1985); Coleman v. Commonwealth, 226 Va. 31, 307 S.E.2d 864 (1983), cert. denied, 465 U.S. 1109 (1984); Waye v. Commonwealth, 219 Va. 683, 251 S.E.2d 202, cert. denied, 442 U.S. 924 (1979). The death sentence has been imposed in cases where the victim, like the victim in this case, was killed solely to assure her silence. Hedrick v. Commonwealth, 257 Va. ___, ___ S.E.2d ___ (this day decided); Justus v. Commonwealth, 220 Va. 971, 266 S.E.2d 87 (1980), cert. denied, 455 U.S. 983 (1982); Smith v. Commonwealth, 219 Va. 455, 248 S.E.2d 135 (1978), cert. denied, 441 U.S. 967 (1979). Based on this review, we conclude that Cherrix's death sentence is neither excessive nor disproportionate to penalties imposed by other sentencing bodies in the Commonwealth for similar and comparable crimes.

## VIII.  Conclusion

We find no reversible error in the issues presented in this case.  After reviewing Cherrix's death sentence pursuant to Code § 17-110.1, we decline to commute the sentence of death.  Therefore, we will affirm the judgment of the trial court.

Record No. 981798 —Affirmed.
Record No. 982063 —Affirmed.