COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Elder and Kelsey
Argued at Salem, Virginia


DONNIE LEE LESTER

                                                 MEMORANDUM OPINION[*] BY
v.        Record No. 1719-03-3                   JUDGE LARRY G. ELDER
                                                 APRIL 27, 2004
COMMONWEALTH OF VIRGINIA


               FROM THE CIRCUIT COURT OF THE CITY OF BRISTOL
                          Charles B. Flannagan, II, Judge

          (Robert E. Wick; Sondra Alan; Law Office of Sondra Kirschner
          Alan, on brief), for appellant.  Appellant submitting on brief.

          (Jerry W. Kilgore, Attorney General; Kathleen B. Martin, Assistant
          Attorney General, on brief), for appellee.  Appellee submitting on
          brief.


        Donnie Lee Lester (appellant) appeals from his jury trial conviction for the second-degree

murder of his wife.  On appeal, he contends the testimony that he confessed to a fellow inmate

was inherently incredible and that the circumstantial evidence was insufficient to prove his guilt

beyond a reasonable doubt.  We hold the evidence of the confession, viewed in the light most

favorable to the Commonwealth, was not inherently incredible and that the evidence as a whole

was sufficient to support appellant's conviction.  Thus, we affirm.

                                             I.

                                       BACKGROUND

        At about 7:30 a.m. on November 20, 2001, Troy Buchanan found his mother, Mary

Lester (Lester), dead in the house she shared with appellant, her husband.  Appellant was not at

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

home. A short time later, appellant was spotted near an abandoned building in an area frequented by vagrants and was arrested for being drunk in public. Later that same day, appellant was arrested for killing Lester. That arrest was based in part on evidence that was subsequently suppressed. In late August or early September 2002, while appellant was being held in the city jail, he told fellow inmate Bradley LaForce that his wife died after he hit her with an ashtray.

At appellant's trial, the Commonwealth offered evidence of appellant's confession to LaForce, as well as medical and bloodstain pattern evidence indicating the victim's injury did not result from an accidental fall and other circumstantial evidence of guilt. Appellant was convicted of second-degree murder and noted this appeal.

II.

ANALYSIS

On appellate review, we must examine the evidence in the light most favorable to the Commonwealth, and we may not disturb the jury's verdict unless it is plainly wrong or without evidence to support it. Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). The conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only if we find that the witness' testimony was "inherently incredible, or so contrary to human experience as to render it unworthy of belief." Fisher v. Commonwealth, 228 Va. 296, 299-300, 321 S.E.2d 202, 204 (1984). In all other cases, we must defer to the conclusions of "the fact finder[,] who has the opportunity of seeing and hearing the witnesses." Schneider v. Commonwealth, 230 Va. 379, 382, 337 S.E.2d 735, 736-37 (1985).

The trier of fact is free to believe or disbelieve, in whole or in part, the testimony of any witness. Rollston v. Commonwealth, 11 Va. App. 535, 547, 399 S.E.2d 823, 830 (1991). A witness is not incompetent to testify simply because he has a criminal record. See Code

§ 19.2-269. As long as a convicted felon's testimony is not inherently incredible, it is up to the trier of fact to determine what weight to give such testimony. See Fisher, 228 Va. at 299-300, 321 S.E.2d at 204. "The weight which should be given to evidence and whether the testimony of a witness is credible are questions [for] the fact finder . . . . However, whether a criminal conviction is supported by evidence sufficient to prove guilt beyond a reasonable doubt is not a question of fact but one of law." Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601-02 (1986).

> In every criminal prosecution, the Commonwealth must prove the element of *corpus delicti*, that is, the fact that the crime charged has been actually perpetrated. [However], if the accused has fully confessed that he committed the crime, . . . only slight corroboration of the confession is required to establish *corpus delicti* beyond a reasonable doubt.

Cherrix v. Commonwealth, 257 Va. 292, 305, 513 S.E.2d 642, 651 (1999) (citation omitted).

Here, although the testimony of convicted felon Bradley LaForce was suspect, it was not inherently incredible. The jury was entitled, as it did, to accept LaForce's claim that appellant confessed hitting his wife with an ashtray. No evidence established that LaForce, a federal prisoner whose release date had already been set when he met appellant, was an agent directed to extract a confession from appellant; knew any of the parties involved prior to meeting appellant in jail; or had anything to gain from fabricating a story about appellant's confession.

LaForce explained that he developed a friendship with appellant because appellant knew one of the guards and used him as a source for cigarettes, which were contraband in the jail. Appellant told LaForce, who had a prior conviction for using dynamite to blow up personal property, that he wanted LaForce, who was scheduled to be released soon thereafter, to take care of a "problem" by burning down both appellant's house and the house of his neighbor, with whom appellant said he had had a fight on the night of Lester's death. Appellant told LaForce that he, Lester, and his stepson, Troy, had an argument the evening Lester was killed. Appellant

- 3 -

said he was angry with Lester because, after Troy left, Lester told appellant to leave, as well. Appellant reported hitting Lester in the head with an ashtray as she sat on a loveseat. Appellant said Lester fell face down onto the floor and "knocked the heater or something over." LaForce reported appellant also said "something about [the heater] not being plugged up or unplugged." Appellant said he went to the store and when he returned, Lester was still face down on the floor. Appellant then "straightened the house up" and "cleaned the ashtrays."

Other evidence corroborated LaForce's testimony of appellant's confession about how the crime occurred and what appellant did afterward. Lester's son, Troy Buchanan, confirmed that, on the evening of the murder, Buchanan was present at the home Lester shared with appellant; Buchanan and appellant had a disagreement on a subject about which they argued frequently; and Lester took Buchanan's side in the argument as she usually did. A few hours later, a neighbor saw appellant "running down the street" away from appellant's house, and appellant did not respond when the neighbor "hollered at him." When Buchanan telephoned his mother's residence at 10:00 p.m. that evening, he received no response.

When Buchanan went to his mother's home the next morning, he found her a few feet from the loveseat, face down in a pool of blood, with her head and arm atop the electrical cord of a heater, which was unplugged. The position of Lester's body near the loveseat and across the heater cord matched the description of the incident that LaForce said he received from appellant. Buchanan observed that a bracelet, which had been in an ashtray on the coffee table on the previous evening, was on the floor, and one of the ashtrays was clean and empty. These observations fit with LaForce's testimony that an ashtray was the weapon appellant used to hit Lester and that appellant wiped it clean afterward. No signs of forced entry were found, and nothing appeared to be missing from the residence.

- 4 -

Finally, when the police found appellant on the morning Lester's body was discovered, he was wearing clothing different from the clothing he wore when his neighbor saw him running down the street away from his house the previous evening. This difference in attire was consistent with LaForce's testimony that appellant went to the store immediately after he hit Lester and later returned to the house to clean up, at which time he could have changed into the clothing he was wearing when arrested. Further, in response to appellant's repeated questions, the arresting officer advised appellant several times that he was arresting appellant for being drunk in public. "After the fourth or fifth time [the officer] told [appellant] 'drunk in public,' [appellant] asked [the officer] if that was all," indicating appellant's awareness that the police might have cause to arrest him for some additional crime.

The autopsy of Lester and an expert examination of the bloodstain pattern analysis found at the scene supported the conclusion that Lester died from a blow to the head rather than from an injury sustained in an accidental fall. Lester's autopsy confirmed that she died from a blunt force trauma to the head combined with her severe coronary artery disease, which caused her to bleed to death more quickly. The medical examiner opined that Lester did not sustain the fatal injury in a fall because she suffered no "contrecoup bruising," or bruising on the opposite side of the brain from the impact, which would ordinarily occur if the injury had been caused by a fall. He also opined that a typical fall would have produced an irregular shaped laceration surrounded by a broad area of abrasion, whereas Lester's injury was a straight line with minimal abrasion. The expert in bloodstain pattern analysis concluded that Lester "was already bleeding when contact was made on various surfaces" in the living room on which blood was apparent. She found no evidence of forcible contact with any item of furniture.

Viewing the evidence in the light most favorable to the Commonwealth, the jury believed LaForce's testimony that appellant admitting hitting his wife on the head with an ashtray.

Significant additional evidence established that Lester's death did not result from an accidental fall and corroborated appellant's confession.  This evidence, as a whole, was sufficient to support the jury's verdict of guilt beyond a reasonable doubt.

### III.

For these reasons, we hold the evidence was sufficient to support appellant's conviction for second-degree murder, and we affirm.

<u>Affirmed.</u>

Benton, J., dissenting.

Because the evidence in this case supports the hypothesis that Mary Lester died as a result of an accident, rather than as a result of homicide, I would hold that the evidence is insufficient to support a conviction for murder in the second degree.

I.

To sustain a conviction for murder, "[t]he evidence must exclude every reasonable hypothesis except that of guilt." Thomas v. Commonwealth, 187 Va. 265, 271, 46 S.E.2d 388, 390 (1948). Thus, the principle is well established that when "[t]he facts are, at least, equally as susceptible of an interpretation which is consistent with the innocence of the defendant as with his guilt," a conviction cannot be sustained. Id.

The evidence proved Mary Lester died as a result of "blunt force injuries to the head as well as contributing severe coronary artery disease." Lester's body was on the floor by a doorway and several feet away from a sofa, which was flush against the walls of the room. No blood was on the sofa or on the carpet between the sofa and her body. Her head was on the floor next to a stereo console cabinet by a wall. On "the vertical end of the stereo cabinet" above her head was a patch of blood. The evidence also proved "one end of [the stereo cabinet] was moved back toward the wall." This was the end of the cabinet next to Lester's head and the same end that contained a smear of her blood. Beneath her body was an electric cord connected to a space heater. The plug to the electric cord was not in an electrical outlet but instead was on the floor next to her body.

The assistant chief medical examiner testified Lester had a "blunt force" injury to her head which caused a laceration wound two inches in length "with minimal circumferential abrasion." Lester also had an abrasion on her left knee, a scrape injury on her right hand, and a bruise on the palm end of the little finger on her left hand. The assistant medical examiner

- 7 -

further testified that Lester's blood contained "drinking alcohol in a concentration of .19 percent" when she died. The "drinking alcohol" level in her vitreous humor was .21%. The medical examiner testified that this level of alcohol would have impaired Lester's motor skills, reflexes, and balance. He testified that the laceration on Lester's head could have occurred by someone hitting her or by her hitting something.

The autopsy report indicated Lester had "80-90% diffuse severe atheromatous narrowings of all three coronary arteries." The medical examiner testified that Lester had "very serious heart disease." He testified that her heart condition "could make you dizzy," and could lead to blackouts. He also testified that her alcohol concentration of .21 would exacerbate her heart problem.

The evidence proved only that Lester died during a fourteen-hour period between the hours of 5:00 p.m. and 7:30 a.m. The medical examiner testified that her death was consistent with an accident. In pertinent part, he explained as follows:

> Q. Okay. Now, if she had fallen against a heater or a stereo or a doorjamb or something, and was there on the floor, is this a wound that would bleed immediately?
>
> A. Yes, sir.
>
> Q. Okay. With the cushion of hair and so forth, would you expect to find any blood on the object that was struck necessarily?
>
> A. It depends. It just depends how much hair and how fast it took for the blood to saturate the hair and get on anything.
>
> Q. Okay. So, it's perfectly plausible, then, that she fell, struck her head on something, and then the bleeding started?
>
> A. Uh, it's possible.
>
> Q. Doctor, is it not correct that very, very few people bleed to death from a scalp injury of this sort?
>
> A. I would say it's not terribly common. There can be a sizable amount of blood loss. And we see that sometimes in people who are impaired, either from strokes or from alcohol or drugs, they

- 8 -

can't seek aid. For example, you may see in people who are impaired and they may make an effort to try to stop the bleeding and then later expire. And, in this lady, she has a heart that is not going to tolerate much blood loss.

\* \* \* \* \* \* \*

Q. Well, Doctor, so I'm not confused, this didn't take a great deal of impact, did it?

A. In Mrs. Lester's case, probably not for several reasons. As you get older, there can be some loss of brain tissue, which makes the space a little bigger and the brain can move a little easier. That can lead to some tearing. Now, that was not real pronounced in her case, but it certainly is a possibility. The other, probably more important issue, is that Mrs. Lester had evidence of previous head injury. In other words, she had some area on this thick covering on the top of the brain where she had had a bleed before. She'd been injured before somehow. This was a remote thing. In other words, it's quite a while away. It was months to years away that she had this. But once you've had that, that area is more likely to be damaged when you have another injury and you're more likely to have bleeding because of it.

Q. So, this could've happened before and it wouldn't take a great deal of force to produce the symptoms that you've described here?

A. Less than it would be, for example, like me or you, assuming you haven't had any head injury.

\* \* \* \* \* \* \*

Q. . . . . And a fall - even a slight fall - could have produced the injury that you have described here in your report?

A. Uh, as I said, I gave the reasons why it doesn't appear to be a fall. But are all falls - do all falls have all these features?

Q. Correct.

A. One hundred percent? No. No. They usually have these features.

Q. And in this particular instance, uh, there are numerous items of furniture in this house; stereos, doorjambs, doors, coffee tables, heaters, other items that might not have any blood on them, but could have been the agent or the object that she fell into?

A. Anything's possible. What I'm describing for you are the usual injuries we see in people who have falls.

Q. Right. But you were talking about - I was talking - you and I briefly were talking about a flat - if you just fell out flat on your head. I'm talking if you hit an object like a table leg or a corner or - any sharp edge - that would produce a straighter injury. Correct?

A. If the object you hit had a straight pattern to it, yes. That could produce a tear that was straight.

Q. And you wouldn't have to have a knife or a -

A. No.

Q. -- solid object. It could be something fairly rounded, even as a table leg or at least not really, really sharp?

A. It's blunt.

Q. Something like this edge? Just blunt?

A. It's blunt. It doesn't have to have a sharp edge.

Q. Okay. And that's what we have in her case?

A. That's correct. This is a tearing of the scalp in a straight line from a blunt object. Not from a sharp object.

A forensic technician testified that the stain pattern on the vertical surface of the stereo cabinet indicates that Lester's head contacted the side of the cabinet during a downward movement.

## II.

Even if Lester's death was, instead, a homicide, no physical evidence tended to prove the appellant committed the homicide. The Commonwealth sought to establish through the testimony of appellant's neighbor that appellant's conduct was suspicious. The neighbor testified that he saw appellant running from his house in the early evening hours and later saw him again wearing different clothes. This evidence presumably was offered to suggest that appellant changed his clothes after killing Lester. However, the evidence did not show that any of appellant's clothes had blood on them and the evidence did not show that the house was tidy when the police arrived.

Although the witness testified at trial that he saw appellant running away from home, he acknowledged in his testimony that the day the police found Lester's body he gave them the following statement:

> Yesterday on November 19th 2001 around 4:30 p.m. or so, . . . . Donnie Lester came up to me from behind and asked to borrow a quarter . . . . I stood with Lester as he drank his beer, and eventually walked up to his house with him. I stayed there about 5-10 minutes and during that time Lester gave me two pruning saws. I remember his wife saying that he'd give the whole house away if he could. She wasn't upset and was smiling about him giving me the saws. She also asked me about my wife Mary. I left and walked home.
>
> The next time I saw Lester was when it was getting dark. He was walking toward his house on West Street and I gave him an aluminum handle for a rake. He needed to repair his rake so he could rake leaves. We talked for a little while longer and Lester wasn't upset. He walked on toward his house and I came inside my house.
>
> The next time I saw Lester was after dark maybe around 8:00 p.m. He was walking away from his house at a fast pace but not running. He was walking toward Sycamore Street. He didn't see me so we did not speak. He was wearing a white t-shirt, blue jeans, and some high top dark colored shoes.

The appellant's conviction was based solely upon the testimony of Bradley LaForce, a convicted felon who was incarcerated in the jail with appellant after his arrest. LaForce, a career criminal, who has been incarcerated half of his adult life, gave testimony that is inherently suspect and that was in conflict with other evidence in the case. While the testimony of an incarcerated felon is not inherently incredible, see Payne v. Commonwealth, 233 Va. 460, 468, 357 S.E.2d 500, 505 (1987), when that testimony is contrary to the other evidence in the case, that testimony is rendered unreliable.

LaForce testified that appellant said he "hit [his wife] in the head with an ashtray" while she sat on a loveseat. He also testified that the blow "knocked her down to the floor" and that appellant later "straightened the house up, dusted and cleaned the ashtrays and everything." No

evidence proved, however, that the ashtrays had been cleaned or that the house was in a tidy condition. Indeed, when a police officer entered the house after Lester's son discovered her body, four ashtrays were on the coffee table. A square amber-colored ashtray contained cigarette residue, a round blue ashtray contained cigarette residue, a round clear ashtray contained a cup and other residue, and a round ashtray with pronounced ridges along the circumference contained no items. The officer testified that the ashtrays were sent to the forensic laboratory for analysis; none of the ashtrays "reflect[ed] any human fibers or blood." Indeed, no evidence proved the ashtrays contained indications they had been used to hit Lester.

LaForce also testified that appellant asked him to burn appellant's house and a neighboring house owned by Ted Eller. Eller testified, however, that he and his wife had assisted appellant and his wife and that they "had a pretty nice neighbor relationship." He testified that he had never known appellant to hit anyone and that he had no reason to believe appellant wanted to harm him. Eller also testified that Lester's "health was poor" and that she had been hospitalized before "because she had fell."

Although the weight and credibility of the testimony of witnesses is the sole province of the jury, LaForce's testimony is not supported by any other evidence and was not sufficiently reliable to support the conviction.

III.

The Commonwealth's evidence failed to exclude the hypothesis that Lester fell onto the stereo cabinet, hit her head on its edge, and rubbed her bleeding head on the vertical side of the cabinet as she fell to the floor. She was highly intoxicated when she fell and had a serious heart condition, which was exacerbated by the alcohol. Indeed, Lester's son testified that when he arrived after 4:45 p.m. on November 19, Lester's speech was slurred and she did not move from the sofa while he was there. He surmised "[s]he probably could walk a bit." This evidence is

- 12 -

consistent with an accidental fall.  Furthermore, the presence of the electrical cord from the space heater beneath her body suggests she was in the process of putting it in a plug when she fell and fatally injured herself.

I would hold that the evidence is insufficient as a matter of law to support the conviction. See Tarpley v. Commonwealth, 261 Va. 251, 257, 542 S.E.2d 761, 764 (2001).  For these reasons, I would reverse the conviction.